456 So.2d 383 (1983)
Michael LINDSEY
v.
STATE.
1 Div. 483.
Court of Criminal Appeals of Alabama.
November 1, 1983.
Rehearing Denied November 29, 1983.
*385 T. Jefferson Deen, III and Robert F. Clark, Mobile, for appellant.
Charles A. Graddick, Atty. Gen., and Ed Carnes and Jennifer M. Mullins, Asst. Attys. Gen., for appellee.
TYSON, Judge.
Michael Lindsey was convicted, pursuant to § 13A-5-40(a)(4), Code of Alabama 1975, of murdering Rosemary Rutland by stabbing her in the back with a knife and shooting her in the head at point-blank range with a pistol, while burglarizing her home.
A separate sentencing hearing was held before the same jury. After hearing the evidence of mitigating and aggravating circumstances, and after receiving proper instructions from the trial court, the jury returned an advisory verdict recommending a sentence of life imprisonment without parole. The trial court then held a separate sentencing hearing and, despite the jury's recommendation, sentenced the appellant to death by electrocution. The trial court's written findings of fact and findings with reference the existence or non-existence of aggravating and mitigating circumstances is attached to this opinion as "Exhibit A."
Mrs. Rosemary Rutland, a 63-year-old widow, was murdered on December 14, 1981, at about 9:00 p.m. Her body was discovered the following morning in a bedroom in her home. She had been gagged and her hands had been bound behind her. The cause of death was the combination of injuries inflicted by a knife and a pistol. The knife entered her back below the shoulder blade and penetrated her right lung. The .38 caliber bullet that was fired into the top of her head at point-blank range through a pillow penetrated her skull and brain. Neither of the murder weapons were recovered. However, there was evidence that the appellant owned a knife, which was never seen again after the murder and that the victim owned a .38 caliber pistol which was, likewise, not recovered after the incident. The state theorized that these missing weapons were, indeed, the murder weapons.
The state's case against the appellant was based upon circumstantial evidence and the appellant's oral confession.
The appellant lived with his wife, Mary Lindsey, in a house behind the victim's home. Ronnie Cobb, Mary's cousin, and Brazell (Pee Wee) Wilson, an eleven-year-old boy that Mary had "raised like a son," also lived with the appellant. Cobb and Wilson testified that on the night of the murder, between 6:30 p.m. and a little after midnight, the appellant, in a series of trips to and from the house, brought into their home a microwave oven, a television set, a stuffed deer head, groceries, and a number of other personal items. He would not tell *386 them the source of the merchandise, which was subsequently identified as the property of the victim.
Wilson further testified that, on at least one occasion that night, he saw the appellant driving the victim's automobile. He also saw a silver pistol stuffed down into the front of the appellant's trousers.
Mary Lindsey testified that when she arrived home after working the evening shift, the appellant told her the source of the merchandise "was none of her business." He did tell her, however, that he had read on the victim's front door a note telling the postman that she would be gone for several days. He also showed her some credit cards, which were later identified as belonging to the victim.
Cobb and the appellant were apprehended the morning after the murder, but before the body had been discovered, when they attempted to purchase some merchandise with the victim's credit cards without verifying identification. (It was the police investigation of this credit card incident that led to the discovery of the victim's body.) They had already purchased other items with these credit cards. These other items and the victim's checkbook were recovered from the car the appellant had been driving that morning.
When arrested, in addition to the victim's credit cards, the appellant had the victim's car keys and the keys to the car he had been driving.
Inside the victim's home the only evidence connecting the appellant with the crime was appellant's palm print removed from a red air pump that had been moved during the burglary and placed in an open suitcase in one of the bedrooms. The house had been "ransacked," but no other identifiable prints were found inside. However, a footprint with an impression matching the sole of the appellant's shoe was found outside in the victim's yard.
The most incriminating evidence against the appellant was Officer Hubert Bell's testimony with reference appellant's eventual oral confession. Shortly after his arrest the appellant told the investigating officers that he had found the credit cards on a side street near Murphy High School. Later, in a tape-recorded statement in the presence of several police officers he stated that "Bob," a man who had given him a ride the day before, returned on the afternoon of the murder and gave him the credit cards. He explained that "Bob" returned later that night with the victim's automobile and that he escorted "Bob" to appellant's back fence where "Bob" handed merchandise over the fence to him. The appellant, then, carried the merchandise into his house. "Bob" also showed the appellant the note that the victim had left the postman. In this tape-recorded statement the appellant denied any knowledge of the murder.
Officer Hubert Bell testified that after the tape-recording session and while the other officers were out of the room, he had an unrecorded conversation with the appellant. The appellant at first stuck to his story about "Bob" but revised it somewhat. At one point the appellant stated that he had entered the victim's house with "Bob," and at another point he stated that "Bob" forced the victim to one of the back bedrooms and shot her in the arm and bound and gagged her. Finally, after Officer Bell told the appellant that "Bob" did not exist, the appellant admitted that he had acted alone, and that he shot the victim because she had recognized him.
The appellant presented no witnesses. Neither did he take the stand in his own behalf. His defense consisted of thorough and sifting cross-examinations of the state's witnesses and arguments to the jury pointing out the weaknesses in the state's case.
The guilt phase hearing resulted in the jury's verdict finding the appellant "guilty of the capital offense as charged in the indictment."

I
The instant appeal is from appellant's second trial for the same capital offense. The appellant contends that this second *387 trial was in violation of state and federal prohibitions against double jeopardy because there was not a "manifest necessity" for terminating his first prosecution.
Appellant's first trial resulted in a mistrial after the jury reported that it could not reach a verdict on the capital offense as charged. After more than two hours of deliberation the jury foreman reported (R.R. 2):
"Your Honor, we are unable at this time to arrive at a unanimous verdict and we await your further instructions."
The trial court explained that the jury had to make a unanimous decision as to the capital offense before it could consider lesser included offenses. The trial court also encouraged the jury to reach a verdict. The jury returned to the jury room for further deliberation and after about an hour the foreman reported (R.R. 5):
"Your Honor, we regret deeply we just cannot arrive at a verdict and it does't [sic] appear likely that we will."
The trial court acknowledged the jury's efforts and declared a mistrial because the jury was "unable to reach a verdict." The appellant objected because the jury had deliberated for only about three hours. At the trial court's request, the foreman reiterated the jury's position that it could not reach a verdict. The trial court refused to poll the jury, but, after some discussion with the jurors, learned, somewhat inadvertently, that the juror split was eleven to one. The trial court then repeated its declaration of a mistrial, discontinued the trial, and dismissed the jury.
The appellant argues that the jury should have been encouraged to deliberate for longer than three hours and that the trial court erred in instructing the jury that it should not consider the lesser included offenses unless it first determined that the appellant was "not guilty" of the capital offense charged in the indictment. We disagree.
The trial court had the authority and discretion to declare a mistrial and discharge the jury when it became clear that the jury could not reach a verdict. Ala.Code § 12-16-233 (1975); United States v. Sanford, 429 U.S. 14, 97 S.Ct. 20, 50 L.Ed.2d 17 (1976) [citing United States v. Perez, 9 (22 U.S.) Wheat. 579, 580, 6 L.Ed. 165 (1824)]; Clements v. State, 390 So.2d 1131 (Ala.Cr.App.), cert. denied, 390 So.2d 1136 (Ala.1980), and cases therein cited. "After such a mistrial, the retrial of the defendant is not barred by double jeopardy." Clements v. State, supra; see, Parker v. State, 51 Ala.App. 362, 285 So.2d 526, cert. denied, 291 Ala. 795, 285 So.2d 529 (1973). Under the circumstances explained above the trial court in the first trial did not abuse its discretion in declaring a mistrial. Therefore, the trial court below did not err in overruling appellant's plea of double jeopardy.
Section 13A-5-41, Code of Alabama 1975, states that "the jury may find a defendant ... not guilty of the capital offense but guilty of a lesser included offense." The trial court's instruction to this effect, that the jury should not consider the lesser included offenses unless it found the appellant "not guilty" of the capital offense was in accordance with and justified by this specific code section. The instruction that the jury's decision should be unanimous, even if the verdict as to the capital offense was "not guilty," was correct and in keeping with a well-established legal principle in non-capital cases. See, Tribble v. State, 145 Ala. 23, 40 So. 938 (1906); Way v. State, 155 Ala. 52, 46 So. 273 (1908); Tooson v. State, 56 Ala.App. 613, 324 So.2d 327, cert. denied, 295 Ala. 426, 324 So.2d 333 (1975). In Littleton v. State, 128 Ala. 31, 29 So. 390 (1900), it was aptly stated:
"The reasonable doubt of guilt by one juror, or by any number of them less than the entire twelve, could not affect the others who did not indulge such doubts, and unless all were reasonably doubtful of guilt, there could be no verdict of not guilty. Such a condition might work a mistrial, but never an acquital."
*388 Although Littleton involved a non-capital, first-degree murder trial, the principle espoused therein is equally applicable to guilt-phase verdicts in capital felony prosecutions.
In United States v. Tsanas, 572 F.2d 340 (2d Cir.), cert. denied, 435 U.S. 995, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978), it was determined that it was not wrong as a matter of law to require a unanimous verdict of not guilty of a greater offense before allowing the jury to consider lesser included offenses. The advantages and disadvantages of such a requirement were discussed in detail therein. The risk of a mistrial, (like the one declared in the instant case) due to such a requirement, was seen as a disadvantage to the prosecution, not the defendant. The noted disadvantage to the defendant was the possibility that those jurors favoring the lesser offense, in order to avoid a mistrial, would be coerced into agreeing with those favoring the greater offense.
In the instant case the trial court's declaration of a mistrial was not only proper but it was also, arguably, in appellant's best interest. The trial court had inadvertently learned that the jury was divided eleven to one, presumably in favor of conviction for the capital offense. Although the jury had deliberated for only three hours, any encouragement to re-deliberate under the circumstances, might have improperly suggested a compromise verdict or coerced the dissenting juror to change his vote and vote for a conviction in order to avoid a mistrial. Compromise verdicts and the coercion of dissenting jurors have been specifically outlawed by our courts. See, Gidley v. State, 19 Ala.App. 113, 95 So. 330 (1923); Orr v. State, 40 Ala.App. 45, 111 So.2d 627 (1958), affirmed, 269 Ala. 176, 111 So.2d 639 (1959). See also, Showers v. State, 407 So.2d 167 (Ala.Cr.App. 1980), rev'd on other grounds, 407 So.2d 169 (Ala.1981).

II
The trail court did not commit reversible error in denying appellant's motion for a free transcript of his mistrial. For aught that appears in the record before us, the appellant had access to and took advantage of adequate alternatives or substitutes for the requested transcript. Appellant's attorneys in the trial below and on this appeal also represented him during the mistrial. There was nothing in the record to indicate that they were denied access to the court reporter from the mistrial for a recitation of any portion of the reporter's notes or that appellant's defense in the second trial was weakened due to the absence of a court-ordered free transcript. In fact, although the source was not divulged, the appellant had and used, during the trial below, certain verbatim transcriptions of testimony from the mistrial to impeach, or refresh memories of, state's witnesses (e.g. R. 228, 449).
Because, in the instant case, adequate alternatives were not only available, but obviously utilized, the appellant was not prejudiced by the trial court's denial of a free transcript of his mistrial. See, Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971); Bryant v. State, 49 Ala.App. 359, 272 So.2d 286 (1972), cert. denied, 289 Ala. 740, 272 So.2d 297, cert. denied, 412 U.S. 922, 93 S.Ct. 2744, 37 L.Ed.2d 149 (1973).[1]

III
The appellant contends that the trial court erred in denying his motion to suppress evidence with reference his incriminating statements to investigating officers on December 16, 1981. The appellant contends that these statements were not voluntarily made but rather were the product of coercive interrogation after he had invoked his right to counsel.
On the night of his arrest the appellant contacted Mr. Donald Friedlander to represent him. At Mr. Friedlander's request the *389 appellant made no statements to the police. The following morning appellant's family and the investigating officers were informed by Mr. Friedlander that he would not be representing the appellant. A few hours later the appellant made a tape-recorded statement in the presence of several investigating officers and an oral statement to Sergeant Hubert Bell.
On voir dire the state's witnesses testified that appellant's statements were voluntarily made. Officer Vince Richardson explained that the statements were made during an interview session with the appellant after Mr. Friedlander had reported that he would not represent the appellant, after the appellant had been re-read his Miranda warnings, including his right to a court appointed attorney, and after the appellant had signed the standard waiver of rights form and had agreed to make a statement. Officer Hubert Bell explained that the 12:45 p.m. interview on December 16, which resulted in the two statements in question, was initiated by the appellant. Bell was participating in a search of appellant's home when the appellant called to speak to Mary Lindsey, his wife. After Bell explained his presence in appellant's home and after he informed the appellant that Mary was not home, the appellant told Bell that he would make a statement as soon as Bell returned to the jail. Both Bell and Richardson testified that the statements were not coerced by threats or by any promises or offers of reward or leniency in exchange therefor.
The appellant did not deny that he was informed of his Miranda rights or that he signed the waiver of rights form before he made the tape-recorded statement. He testified on voir dire, however, that he was coerced to make the recorded statement by comments from the investigating officers to the effect that Cobb had already made a statement implicating the appellant and that if the appellant did not make a statement, he would probably be electrocuted. Furthermore, he denied making the oral statement to Bell, the statement in which he finally admitted his involvement in Mrs. Rutland's murder. He again stated that he had no knowledge of the murder.
After this thorough voir dire hearing and in light of appellant's testimony that his recorded statement was coerced and that he never confessed to the murder, the trial court determined that both statements were voluntarily made and were, therefore, admissible. This determination was within the sound discretion of the trial court, which was in the best position to determine the credibility of the voir dire witnesses. Because this determination was supported by a preponderance of the evidence, it will not be disturbed on this appeal. See, generally, Singleton v. State, [Ms. 1 Div. 361, February 1, 1983] (Ala.Cr. App.1983), and cases cited therein; see also, Williams v. State, [Ms. 6 Div. 761, May 31, 1983] (Ala.Cr.App.1983) (concise discussion of standards of review of trial court voluntariness determinations). The state's evidence clearly supported a conclusion that the appellant, after invoking his right to counsel and his right to remain silent (at Friedlander's request), voluntarily changed his mind and decided to waive those rights and make a statement. See, Moulds v. State, 429 So.2d 1176 (Ala.Cr.App.1983), and cases therein cited. The credibility of the subsequent statements was, of course, within the province of the jury.

IV
The trial court refused to give appellant's jury charge No. 25, which requested the trial court to instruct the jury "that if you are not convinced ... that Michael Lindsey [the appellant] was the person who actually caused the death of the deceased, then you cannot find him guilty of a capital offense." This charge was properly refused because it is not a correct legal principle. A "non-triggerman," who does not actually cause the victim's death, can, nevertheless, be properly convicted of a capital offense if it is proven that he was an accomplice in the intentional killing. See, Ritter v. State, 375 So.2d 270 (Ala. 1979), vacated on other grounds, 448 U.S. *390 903, 100 S.Ct. 3044, 65 L.Ed.2d 1133 (1980); Raines v. State, 429 So.2d 1111 (Ala.1982), affirming, 429 So.2d 1104 (Ala.Cr.App.); Womack v. State, 435 So.2d 754 (Ala.Cr. App.), affirmed, 435 So.2d 766 (Ala.1983).
The trial court's oral charge properly covered the requirements for a capital felony conviction.

V
After a proper sentencing hearing the jury recommended that the appellant be sentenced to "life imprisonment without parole." Instead, the trial court, after independently weighing the aggravating and mitigating circumstances, sentenced the appellant to death by electrocution. The appellant insists that the trial court was not authorized to disregard the jury's recommendation of sentence. Appellant's position is without merit. See, Murry v. State, 455 So.2d 53 (Ala.Cr.App.1983); Jones v. State, 456 So.2d 366 (Ala.Cr.App.1983).

VI
Appellant's contention that the death penalty is "cruel and unusual punishment" has, likewise, been resolved against him. Beck v. State, 396 So.2d 645 (Ala. 1980); Luke v. State, 444 So.2d 393 (Ala. Cr.App.1983).

VII
Following the mandates of § 13A-5-53, Code of Alabama 1975, we have carefully reviewed the propriety of the death penalty in this case.
There were no errors during the sentencing-phase hearings which adversely affected appellant's substantial rights.
In its findings of fact (see, Appendix A) the trial court found as aggravating circumstances that:
(1) "the capital offense was committed by Michael Lindsey while he was under a sentence of imprisonment, although he was serving the latter part of one sentence on parole ...";
(2) "the defendant was previously convicted of another felony involving the use or threat of violence to the person";
(3) "the capital offense was committed while the defendant was engaged in the commission of a burglary in the first degree"; and
(4) "the capital offense was especially heinous, atrocious or cruel as compared to other capital offenses."
The trail court examined the enumerated mitigating circumstances and the evidence of non-enumerated mitigating circumstances and concluded that there were "no mitigating circumstances in any aspect of the defendant's character or record or of any circumstances of the offense."
These findings and conclusions by the trial court were fully supported by the evidence in this case.
The jury recommended, by a vote of 11 to 1, that the appellant be sentenced to life imprisonment without parole. The trial court acknowledged this recommendation but instead imposed the death penalty because "the aggravating circumstances far outweigh any mitigating circumstances." After a thorough review of the entire record we are convinced that this sentence was imposed without the influence of passion, prejudice or any other arbitrary factor.
Furthermore, our independent weighing of the aggravating circumstances in the absence of mitigating circumstances has indicated that death was, indeed, the appropriate sentence in this instance.
Finally, after considering both the nature of the crime and the character of this appellant, we have concluded that the death penalty is not disproportionate or excessive as compared to the penalty imposed in similar cases.
In spite of appellant's excellent representation, both at trial and on appeal, the factual and legal issues have been decided against him. His conviction and sentence of death are, therefore, hereby affirmed.
AFFIRMED.
All the Judges concur except BOWEN, P.J., who dissents with opinion.

*391 APPENDIX A

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

THE STATE OF ALABAMA

vs.

MICHAEL LINDSEY, Defendant.

CASE NO: CC-82-212

ORDER
The Court, having conducted a hearing pursuant to Section 13A-5-47 of the Code of Alabama (1975) to determine whether or not the Court will sentence Michael Lindsey to death or to life imprisonment without parole, and the Court having considered the evidence presented at the trial and at said sentencing hearing, the Court makes the following findings of fact:
The Court first considers the aggravating circumstances as outlined and described in Title 13A-5-49:
(1) The Court finds that the capital offense was committed by Michael Lindsey while he was under a sentence of imprisonment, although he was serving the latter part of one sentence on parole and the latter part of another sentence on probation;
(2) The Court finds that the Defendant was previously convicted of another felony involving the use or threat of violence to the person;
(3) The Court finds that there is no evidence that the Defendant did knowingly create a great risk of death to many persons;
(4) The Court finds that the capital offense was committed while the Defendant was engaged in the commission of a burglary in the first degree;
(5) The Court finds the capital offense was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
(6) The Court finds that the capital offense was not committed for pecuniary gain;
(7) The Court finds the capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws;
(8) The Court finds the facts to be that the body of the victim, Rosemary Rutland, an elderly woman, was found in her home, face down, gagged and her hands bound behind her. It was proved that the victim had been stabbed in the back and shot in the head with a .38 caliber pistol, and that she died as a result of either the stabbing or the shooting, or both. The Court finds that the killing of Rosemary Rutland was outrageously wicked, vile and shockingly evil. The Court finds from the evidence that the capital offense was especially heinous, atrocious or cruel as compared to other capital offenses.
The Court finds beyond a reasonable doubt and to a moral certainty that the aggravating circumstances described in Section 13A-5-49 of the Code of Alabama (1975) and set out hereinabove in subparagraphs (1), (2), (4) and (8) apply to the Defendant, Michael Lindsey, in this case.
The Court now considers the mitigating circumstances as described in Sections 13A-5-51 and 13A-5-52 of the Code of Alabama (1975):
(1) The Court finds that the Defendant, Michael Lindsey, has a significant history of prior criminal activity, including an extensive juvenile record;
(2) The Court finds that the capital offense itself was not committed while the Defendant was under the influence of extreme mental or emotional disturbance;
(3) The Court finds that the victim was not a participant in the Defendant's conduct and did not consent to the act.
(4) The Court finds beyond a reasonable doubt and to a moral certainty that the Defendant committed the capital offense with which he was charged, and that although there is a possibility that an accomplice was involved, the Court is satisfied from the evidence beyond a reasonable doubt and to a moral certainty that the Defendant was not a mere accomplice *392 whose participation was relatively minor, but that the Defendant, Michael Lindsey, actually caused or assisted in causing the death of the deceased, Rosemary Rutland.
(5) The Court finds that the Defendant did not act under extreme duress or under the substantial domination of another person;
(6) The Court finds that the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired;
(7) The Court finds that the Defendant was twenty-one (21) years of age at the time this capital offense was committed, but the Court finds that his age is not a mitigating circumstance.
In addition to express statutory mitigating circumstances set forth in Section 13A-5-51, the Court has considered Section 13A-5-52, and finds no mitigating circumstances in any aspect of the Defendant's character or record or of any circumstances of the offense. The Court is judicially aware that the jury which found the Defendant, Michael Lindsey, to be guilty of the capital offense, and which rendered an advisory verdict herein, returned a vote of eleven (11) jurors recommending the punishment be fixed at life without parole, and one (1) juror recommending that the punishment be death.
The Court having considered all of the mitigating circumstances, and, in addition, having listened to and having considered all of non-statutory mitigating circumstances, the Court is convinced beyond a reasonable doubt and to a moral certainty and it is the judgment of the Court that the aggravating circumstances far outweigh any mitigating circumstances and, notwithstanding the recommendation of the jury, the Court is satisfied beyond a reasonable doubt and to a moral certainty and it is the judgment of this Court that the death penalty be imposed against the Defendant.
It is therefore considered and adjudged that Michael Lindsey is guilty of the capital offense charged in the indictment and specifically of intentionally killing Rosemary Rutland during the course of a burglary in the first degree.
It is therefore ORDERED, ADJUDGED AND DECREED that you, Michael Lindsey, suffer death by electrocution at any time before the hour of sunrise on the 8th day of December, 1982, inside the walls of the William C. Holman Unit of the Prison System at Atmore, Alabama, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution.
It is therefore further ORDERED, ADJUDGED AND DECREED by the Court that the Warden of William C. Holman Unit of the Prison System at Atmore, or in the case of his death, disability or absence, his Deputy, or in the event of the death, disability or absence of both the Warden and his Deputy, then the person designated as Administrator by law for such purpose, at any time before the hour of sunrise, shall on the 8th day of December, 1982, inside the walls of the William C. Holman Unit of the Prison System at Atmore, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution, cause to pass through the body of the said Michael Lindsey, a current of electricity of sufficient intensity to cause his death, and the continual application of such current through the body of the said Michael Lindsey until the said Michael Lindsey be dead, and may Almighty God have mercy on Your Soul.
ORDERED this the 8th day of September, 1982.
 /s/ Braxton L. Kittrell, Jr.
 Braxton L. Kittrell, Jr.
 Circuit Judge,
 Thirteenth Judicial Circuit
BOWEN, Presiding Judge, dissenting.
I dissent on authority of Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971). I do not think that the fact that appointed defense counsel personally financed the purchase of a portion of the record of the former trial constitutes a constitutionally adequate alternative contemplated by Britt. Additionally, it must *393 be noted that "(a) defendant who claims the right to a free transcript does not, under our cases, bear the burden of proving inadequate such alternatives as may be suggested by the State or conjured up by a court in hindsight." Britt, 404 U.S. at 230, 92 S.Ct. at 435. See also Zeigler v. State, 426 So.2d 526 (Ala.Cr.App.1983).
NOTES
[1] The two attorneys who so conscientiously represented this appellant, at trial and on this appeal, paid for more than 60 pages of the transcript of the first trial from their own funds. We commend them for their dedicated efforts in this matter.