Lynn Benjamin Johnson was indicted in a two-count indictment for the capital offense of murder for hire (in violation of § 13A-5-40(a)(7), Code of Alabama 1975). The jury found the appellant "guilty of conspiracy to commit murder as charged in Count II" and, following a sentencing hearing, *Page 495 
the trial judge set punishment at life imprisonment in the penitentiary.
Ricky Gaskin testified that he was involved in a business known as the Dreamers Pre-21 Club (hereinafter referred to as "Dreamers"). He was a partner in the ownership of this club along with Steve and Judy Fowler, Jeff Sheffield and Steve Cleckler. Steve and Judy Fowler ran Dreamers on a day-to-day basis. The partners began having problems with the Fowlers and their management of Dreamers. They discussed these problems with an attorney and with City Hall, which held a lease on the premises. Gaskin and Cleckler then began having a series of meetings to discuss the problems with Dreamers and the Fowlers. Cleckler told Gaskin that he was talking to someone about "getting something done to the Fowlers". At a subsequent meeting, Gaskin told Cleckler that he could get the job done for $1,000.00.
The appellant then set up a meeting between Gaskin, appellant and Bobby Campbell. Gaskin was told to act as a "Mafia" figure to Bobby Campbell and make him think he could get a large loan through the crime organization to "pay off" his business debts. This plan was carried out. The appellant then had a meeting with Cleckler at which time Cleckler paid him $1,000.00. Cleckler was told that the "job" would be done around Christmas. Appellant then told Gaskin to tell Bobby Campbell that he (Campbell) had a job to do. Campbell arrived at the meeting and Gaskin told him he had a job to do. Appellant then told Campbell that he had to "get rid of Fowler" and that he had to plan the killing.
The next night appellant, Campbell and Gaskin met again. Appellant told Gaskin to get a gun for Campbell. The next day they met again and Gaskin gave Campbell a gun, some ammunition and some gloves. Gaskin told Clecker not to come around Dreamers on Christmas and Cleckler was to give Sheffield this message.
On the morning of December 26, 1984, the appellant called Gaskin and told him to meet him and Campbell at a restaurant at 8:00 a.m. At this meeting, Campbell told appellant to call Fowler's home and tell him that he needed to come to Dreamers to divide the money from the video games and make some repairs. The appellant had some 18 video games in Dreamers. They then left and went to a pay phone. Appellant called Fowler, while Campbell went to Dreamers. Gaskin stated that he heard the appellant, Johnson, say on the phone that he would call back. Appellant made another phone call and Gaskin heard him ask Fowler to come to Dreamers and divide the money. Appellant and Gaskin then drove to Dreamers and told Campbell that Fowler was on his way.
Gaskin and appellant then drove over to Billy Bob's in Gaskin's car. Billy Bob's was located across the street from Dreamers. Gaskin parked the car in the parking lot and he and appellant began watching Dreamers. After some time had passed, Gaskin observed a young man park next to them and go into Billy Bob's. Gaskin then saw Steve Fowler drive up at Dreamers. Campbell and Fowler proceeded into Dreamers and at that time the appellant told Gaskin that they had to stop this act. They drove across the street and as they were getting out of the car at Dreamers they heard four shots. They proceeded into the club and observed Fowler's body lying on the floor in the bay area. Campbell then came out of this area with Gaskin's gun. Campbell rolled the body up in a sheet of plastic and Campbell and appellant, Johnson, removed the body. Gaskin heard a car engine in the bay area and they heard the sound of doors slamming and Campbell saying that he was gone. Gaskin heard a car pull away and the bay area doors close. Gaskin and the appellant then began cleaning up the bay area. As they were cleaning up, Sheffield and his brother came in Dreamers. Appellant told Gaskin to get rid of them, which he did. Gaskin then gathered the cleaning supplies, put them in his car and left to go home. As he was leaving he noticed that Fowler's car was gone. Once he got home, appellant *Page 496 
called him and asked if he made it home okay. Gaskin told appellant that he was leaving in a little while. Gaskin placed the cleaning supplies in another car and drove to Douglasville, Georgia. He threw a mop and mop bucket into some brush behind a bank and then threw a trash bag into a dumpster at a convenience store. He then took an old shoulder holster and drove to a wooded area, discarding this item. He then returned home.
A few days later Campbell, Gaskin and the appellant drove to Guntersville in order to get rid of the pistol used in the crime. Campbell broke the gun into pieces on a piece of concrete and threw the pieces into the river.
They then discussed what they would tell the police if questioned. They agreed to say that appellant called Gaskin because Fowler had not shown up. Gaskin was to say that he went to Dreamers to let the appellant in where he worked on the video machines briefly. They then supposedly left Dreamers. The appellant and Campbell were to have then left and gone back to Albertville when Fowler did not show up. Gaskin told the police this story when questioned. He told several other stories to police before finally telling the truth as to what really happened. Gaskin was promised immunity for his testimony in this cause.
Dr. Joseph Embry testified that he was a staff pathologist with the Department of Forensic Sciences. He received two small pieces of bone to test. One was 5mm and the other 4mm. They were approximately 2mm thick and were compatible with certain areas of the human skull and vertebrae. He found a gunpowder particle on one piece of bone.
Steve Cleckler testified that he was a partner in Dreamers along with Steve Fowler, Jeff Sheffield and Rick Gaskin. They had problems with the club, which the Fowlers were managing. Such problems were monies unaccounted for, receipts, image problems and internal conflicts. Cleckler met with Gaskin on several occasions about the problems at the Club. He had talked to two people about taking care of the situation. Gaskin told him he knew someone who could take care of the problem. A few days later, Gaskin told him the appellant's name and stated that appellant was involved with the "Mafia". Several days after this conversation, the appellant called Cleckler and asked him if he wanted "two stumps removed." A few days after this, Gaskin told him that the job would cost each of them $1,000.00. Appellant then called Cleckler and told him to get his money together and a meeting was set up, at which time Cleckler was to pay appellant the $1,000.00. Cleckler went to this meeting and, upon his arrival, he saw Campbell sitting in a parked car. Campbell and Gaskin left and Cleckler gave the appellant the money.
A few days later Gaskin called and told him not to go to the club the day after Christmas. Cleckler admitted to helping plan the murder. Cleckler pled guilty as an accomplice in the murder of Steve Fowler and received a 25 year sentence in return for his agreement to testify.
James Booth testified that he leased an apartment next door to the Fowlers. On December 26, 1984, around 9:00 a.m., he got a phone call for Steve Fowler. He tried to buzz the Fowler's extension but they did not answer. He told the man on the phone to call back and let the phone ring until they answered. Someone called right back and the phone rang five or six times. Approximately fifteen minutes later he heard Fowler's car start and he observed Steve Fowler back out of the driveway.
Betty Woody testified that she was employed at Billy Bob's. On December 26, 1984, she went to work a little before 9:00 a.m. Upon her arrival she observed a white car with a dark red top in Billy Bob's parking lot along with a black van and a black V.W. She saw the same white car on the rear of the parking lot at approximately 10:00 a.m.
Jeff Sheffield testified that he was a partner in Dreamers, along with the Fowlers, Rick Gaskin and Steve Cleckler. His *Page 497 
testimony is related in the discussion of the issue raised on appeal.
Jackie Aaron testified that he was employed by Billy Bob's. On December 26, 1984, he arrived at work at approximately 10:00 a.m. When he arrived he observed a white car with a dark red top parked on the back of the parking lot. There were two men in this car, Rick Gaskin (whom the witness knew from school) and the appellant, Johnson.
A number of police officers testified as to statements given by the appellant and Campbell and to the finding of Fowler's car and the evidence recovered. They found blood on and in the trunk of Fowler's car. They found blood in Dreamers by using a chemical testing agent on the floors.
Jimmy Darlene Johnson testified that she is married to the appellant and that they have two children. Ms. Johnson stated that she worked on December 26, 1984 until approximately 3:00 p.m. As she was arriving home from work at approximately 3:30 p.m. she observed Bobby Campbell leaving her home. Appellant stayed home until shortly after 7:00 p.m., when he left to go to Movie Rental, a business they own. He returned home around 8:30 p.m.
Shirl Johnson testified that the appellant is his father. On December 26, 1984, his father and Bobby Campbell came to their house at approximately 1:00 p.m. Appellant and Campbell worked in a shed behind the house until some time after 3:00 p.m.
Lynn Benjamin Johnson, the appellant in this cause, testified that he knows Rick Gaskin, Steve Cleckler, Jeff Sheffield, Bobby Campbell, and Steve and Judy Fowler. He stated that he had never had any problem with Fowler. He testified that he gave three statements to the police in which he stated that he and Campbell went to Dreamers on December 26, 1984 and, when Fowler did not show up, he called Rick Gaskin to let him into the club. He stated that these statements were not the truth and that he only gave these statements because he was scared of Rick Gaskin, who told him what to say if questioned. The appellant related a story to the jury in which he said that Gaskin was extorting money from him and had been so doing since early 1982. Johnson stated that Gaskin told him he was involved with the "Mafia" and that, if appellant did not do what he said, Gaskin would have killed him and/or his family. Johnson also stated that he had never talked about shooting Fowler, knew of no reason why anyone would want to kill Fowler and never took any money from Cleckler or Gaskin.
Johnson stated that on December 26, 1984, he called Gaskin at approximately 7:00 p.m., as he had been previously told to do by Gaskin. Gaskin told him to get Campbell and meet him at a restaurant. They did this and Gaskin told them to call Fowler to come open Dreamers so they could collect the money from the video games. Appellant, Johnson, did this and Fowler stated he would be there shortly. Johnson then told Gaskin that Fowler was on his way to the club. Gaskin then told appellant that he did not want him and Campbell at Dreamers until after 10:30 that morning. Johnson and Campbell then went to Gadsden Mall. They left the mall and went to Dreamers around 10:30 a.m.
Upon arrival they saw Gaskin's car parked out front. They knocked on the door and Gaskin let them in the club. Gaskin told them to say that they had called Fowler but that he didn't show up at the club, so they called Gaskin to let them in the club. Gaskin then told them to leave the club. Appellant did not see Fowler, any other vehicles or any blood. He and Campbell then went to his house after riding around a while.
 I
It appears from the brief of appellant that he has attempted to raise four issues for the court to review pursuant to his appeal.
In three of these four issues, i.e. (1) indictment being defective, (2) improper denial of motion for change of venue due to pre-trial publicity, and (3) that the trial judge erred in his oral charge to the jury, *Page 498 
the appellant has failed to argue or state any supporting legal authority. This court has dealt with a situation of similar import in Vinzant v. State, 462 So.2d 1037
(Ala.Crim.App. 1984), cert. denied, 462 So.2d 1037 (Ala. 1985). We quote with approval the following language from Vinzant:
 " 'According to A.R.A.P. 45B, this court is not obligated to consider questions or issues not presented in briefs on appeal. The appellant's brief, according to A.R.A.P. 28 (a)(3), shall contain a statement of issues presented for review with principal authorities of law supporting each issue presented. Furthermore, A.R.A.P. 28(a)(5) requires that the argument presented in a brief shall contain contentions of appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied upon.
(emphasis added).
 "The logic behind these rules is consistent with prior decisions relating to failure of appellant to meet the requirements established by the Alabama Supreme Court for briefs on appeal. Arguments not based on any legal authority have the same effect as if no argument had been made, and the argument will be deemed waived. Jones v. City of Decatur, 53 Ala. App. 470, 301 So.2d 235
(Ala.Cr.App. 1974); Terry v. City of Decatur, 49 Ala. App. 652, 275 So.2d 167 (Ala.Cr.App. 1973); Adams v. State, 291 Ala. 224, 279 So.2d 488 (1975). The logic and procedural considerations of the decisions of this court prior to the enactment of the Alabama Rules of Appellate Procedure are embodied within the foregoing enumerated rules."
Vinzant, supra at 1039.
The Alabama Court of Civil Appeals follows this above line of logic and reasoning when confronted with a brief which fails to conform to the minimum requirements of Rule 28(a), A.R.A.P. SeePorter v. Porter, 477 So.2d 433 (Ala.Civ.App. 1986); Richardsv. General Motors Corp., 461 So.2d 825 (Ala.Civ.App. 1984);Shory v. Peavy, 431 So.2d 1319 (Ala.Civ.App. 1983). InRichards, supra, the court stated that "where the appellant fails to cite authority for his positions asserted on appeal we may affirm the decision below since '[i]t is neither our duty nor function to perform all of the legal research for appellant.' Rapaco, Inc. v. Agee, 453 So.2d 1048
(Ala.Civ.App. 1984); Shory v. Peavy, 431 So.2d 1319 (Ala.Civ.App. 1983); Rule 28 (a)(5), Alabama Rules of Appellate Procedure. See also,Welch v. Turner, 411 So.2d 143 (Ala.Civ.App. 1982); WilliamWilson Enterprises, Inc. v. Napier, 395 So.2d 89
(Ala.Civ.App. 1981)." See also, Eady v. Steward Dredging ConstructionCompany, 463 So.2d 156 (Ala. 1985).
In the case at bar, the argument section of appellant's brief essentially consisted of nothing more than a statement of these three issues without any argument or legal authority to support such argument or contention. In this instance the three issues are deemed waived. See Vinzant, supra; Andres v. State,473 So.2d 1211 (Ala.Crim.App. 1985).
Moreover, there was no demurrer filed below challenging this indictment. There was a "motion to Quash or Dismiss" the indictment filed. The indictment being in proper code form, this motion was properly denied.
As to the motion for change of venue, the trial judge heard all the evidence and arguments with reference to this motion and determined that the climate was not one of inherent prejudice against this appellant and that a fair trial could be had in Etowah County, Alabama. This motion was properly denied and overruled. Robinson v. State, 430 So.2d 883
(Ala.Crim.App. 1983) and authorities cited therein.
Finally, as to appellant's challenge to the trial court's oral charge we find the following. (R. 1050) At the conclusion of the trial court's order, the appellant made his exceptions to the charge essentially on three points, which are: (1) that the charge on murder for hire was not a correct statement of law; (2) that the charge on conspiracy was confusing when taken along with complicity; and (3) that the charge did not *Page 499 
properly cover the elements of murder and overall was "confusing to the jury".
At this point, appellant's counsel failed to tender any written requested charges as to these three matters. SeeAllen v. State, 414 So.2d 989 (Ala.Crim.App. 1981), affirmed,414 So.2d 993 (Ala. 1982); Rule 14, Alabama Temporary Rules of Criminal Procedure. However, at the charge conference counsel did tender some seventy written requested charges. All such charges which were tendered to the trial court were approved and given by the trial judge. These charges, when read together with the oral charge of the court, properly covered the matters complained of and, therefore, no error appears. Ala. Code §12-16-13 (1975).
 II
The appellant's final contention has been arguably properly raised in brief and as such, we will address it. The appellant argues that he was convicted on the uncorroborated testimony of an accomplice and urges reversal of his conspiracy conviction at this point.
It is clear in Alabama that "[a] conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense and such evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient." Ala. Code § 12-21-222 (1975). Further, this court recently set out the law on corroboration of accomplice testimony in Pickett v. State, 489 So.2d 673
(Ala.Crim.App. 1986). We quote the following from Pickett:
 " 'The formula applied to the corroboration statute, Ala. Code § 12-21-222 (1975), requires that the evidence of the accomplice must first be 'eliminated and then, if upon review of all other evidence before the trial court at the time of the motion to exclude, there is found to be sufficient incriminating evidence which would tend to connect the accused with the crime, sufficient corroboration exists, Ware v. State, 409 So.2d 886
(Ala.Cr.App. 1981), cert. denied, 409 So.2d 883
(Ala. 1982); Mills v. State, 408 So.2d 187
(Ala.Cr.App. 1981); McCoy [v. State, 397 So.2d 577
(Ala.Cr.App. 1981)], supra. Slaton v. State, 397 So.2d 227 (Ala.Cr.App.), cert. denied, 397 So.2d 332 (Ala. 1981).'
' . . .
 ' "The corroboration of an accomplice must tend to connect the accused with the commission of the crime but need not refer to any statement or fact testified to by the accomplice. 'Corroborate means to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony' . . . The corroborative evidence need not be strong, nor sufficient of itself to support a conviction, the criterion being that it legitimately tend to connect the accused with the offense. . . . Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice. . . . Corroborative evidence need not directly connect the accused with the offense but need only tend to do so. . . . ('[B]ut, as we read the cases, the corroboratory evidence, if it meets the test of "tending to connect the defendant with the commission of the offense," need not be, in and of itself alone, that tending in any wise to fasten guilt upon the defendant'); 23 C.J.S. Criminal Law § 812(3)(1961). The sufficiency of corroborating evidence is established if its probative value tends to connect the defendant with the commission of the crime. . . . The corroboration of an accomplice may be shown by circumstantial evidence." (Citations omitted). Andrews v. State, 370 So.2d 320, 322 (Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala. 1979).' Harris v. State, 420 So.2d 812, 817 (Ala.Crim.App. 1982).
 'In certain instances, association with the accomplice tending to show the accused's proximity, chronologically and geographically, to the alleged offense may furnish sufficient corroboration. Ross v. State, *Page 500 74 Ala. 532 (1883); DeGraaf v. State, 34 Ala. App. 137, 37 So.2d 130 (1948).' Andrews v. State, 370 So.2d 320, 322 (Ala.Crim.App.), cert. denied, 370 So.2d 323 (Ala. 1979)." Pickett, supra at 674-675.
There was testimony at trial by Mrs. Woody that at 9:00 a.m. on December 26, 1984, she observed a white car with a dark red top in the parking lot of Billy Bob's, which was directly across the street from Dreamers. Mr. Jackie Aaron, also an employee of Billy Bob's, observed the defendant and one Rick Gaskin sitting in a white car with a dark red top in the parking lot of Billy Bob's at approximately 10:00 a.m. on the morning of December 26, 1984. Mr. Booth, the Fowlers' landlord, testified that he received a phone call for Steve Fowler on the morning of December 26, 1984, around 9:00 a.m. Booth told the caller to call back and let the phone ring until the Fowlers answered. Someone called right back and the phone rang five or six times. Approximately 15 minutes later Booth observed Fowler leave his home in his car.
Jeff Sheffield testified that he was one of the partners in the Dreamers Club. He testified that Mr. Gaskin told him not to come to the club around Christmas. On December 26, 1984, Sheffield drove past the club at approximately 10:00 a.m. and observed a white car with a dark red top (Gaskin's father's car) and a blue van. He turned around to go to the club and, as he approached, he observed Bobby Campbell driving away from the club in Steve Fowler's car. Sheffield went and picked up his brother and the two of them went to the club. They entered and Rick Gaskin met them just inside the door and told them to get out, that they were checking the security system. Sheffield heard the appellant's voice coming from the bay area of the club. The appellant, Johnson, was telling Gaskin to "get them out".
There was evidence of blood found in the bay area of the club. There was blood found in the trunk of Fowler's car which was consistent with his blood type.
A consideration of all the facts of this case in light of the authorities cited above leads us to conclude that the testimony of Gaskin and Cleckler was properly corroborated. There was corroborative evidence presented at trial which tended to connect this appellant, Johnson, to the commission of the offense charged in the indictment. No error appears.
Therefore, this case is due to be and is, hereby, affirmed.
AFFIRMED.
All the Judges concur. *Page 1005