Glenndy Belle Smith was indicted for murder in violation of § 13A-6-2, Code of Alabama 1975 (C.R. 5). The jury found the appellant "guilty of murder". (R. 288, C.R. 3). She was sentenced to serve a term of 50 years' imprisonment in the state penitentiary. (R. 301, C.R. 3).
Because the appellant does not raise the sufficiency of the evidence as an issue on appeal, the facts of the case will be only briefly stated.
The evidence presented by the State showed that on July 24, 1985 at approximately 1:00 a.m., the appellant stabbed the victim, Billy Earl Knight, in the chest with a large, survival-type knife. Knight was pronounced dead at a local hospital shortly after the incident. The stabbing took place inside of a bar known as "The Elk's Club" located in Macon County, Alabama.
The stabbing occurred during an altercation involving the victim, the appellant and the victim's girlfriend, Joann Cannon. Ms. Cannon, who was also injured during the incident, testified that on the night in question she was walking to the dance floor of the bar with the victim and, when she passed the appellant, the appellant called her a "bitch". Ms. Cannon testified that she continued walking toward the dance floor. She then heard the appellant call out to the victim who was walking behind her.
The statement made to the victim concerned accusations Ms. Cannon had made approximately two months earlier that the appellant's mother had stolen her [Ms. Cannon's] purse.
After the appellant had called out to the victim twice, he turned toward her and "told her [the appellant] that he didn't know nothing about her and be didn't care nothing about her." (R. 29). The appellant *Page 1038 
then removed the knife from her purse and stabbed the victim.
Randolph Crawford testified that he was a friend of the appellant and had seen the appellant and Ms. Cannon arguing at the club on the night in question. (R. 168, 169). Prior to the stabbing, on the night in question, he heard the appellant say "she was going to kill her a m_____ f_____." (R. 173, 174).
The chest wound which caused the victim's death was an extremely large puncture wound (over four centimeters in length) to the heart and left lung. (C.R. 50). The knife used by the appellant had a six-inch blade which had a bottle opener and a jagged, sawtooth edge on one side. The handle of the knife was colored in a camouflage pattern and had a compass in the top. (R. 78, 79, 137-139).
The appellant claimed that she acted in self defense. She testified that Ms. Cannon initiated the name calling and then the victim grabbed her by the wrist. (R. 183). The appellant claimed that the victim slapped her while he was holding her wrist (R 184), and then said that he was going to hold her down while Ms. Cannon beat her up. The appellant testified that Ms. Cannon had a broken bottle in her hand and was about to hit her with it just before she took the knife out of her purse and stabbed the victim in the chest. (R. 184).
The appellant testified that the victim did not have anything in his hand when she stabbed him, (R. 202) and that Mrs. Cannon did not try to help the victim after he was stabbed. The appellant testified that, after she stabbed the victim, Ms. Cannon hit her with the bottle and the two started "tussling". (R. 209).
Pictures taken of the scene shortly after the incident revealed no evidence of broken glass or bottles in the area. (R. 36, 37).
The second defense witness, Derick Henderson, testified that the victim had grabbed the appellant and hit her just prior to the stabbing. (R. 216-217). He testified that Ms. Cannon did not have a bottle or a knife in her hand prior to the stabbing. (R. 225, 228). He stated that Ms. Cannon did go over and try to help the victim after he was stabbed and had fallen to the floor. (R. 226). The victim did not have a knife, a gun or any kind of weapon on the night of the murder. (R. 228, 229).
The third defense witness, Ossie Cardwell, testified that the victim hit the appellant and then "came at her with a knife". (R. 232).
 I
The appellant contends that "the general attitude and conduct of the trial judge . . . tended to show contempt of [her] counsel to such a . . . degree . . . that [she] was denied a fair and impartial trial." . . . . (Brief of appellant p. 5).
She cites two specific incidents from the record in support of her contentions. The first allegedly prejudicial incident occurred during the direct examination of the appellant. Toward the beginning of defense counsel's direct examination, the following occurred:
 "Q. [Mr. Thompson]: Okay, Now, you've seen this knife that they have been parading around in front of the jury. What —
"THE COURT: Hold up just a second.
"MR. CLARK: Object to that, Your Honor.
 "THE COURT: Okay. Ladies and gentlemen, go out to the jury room for just a minute.
"(Jury not present.)
"THE COURT: Mr. Thompson, why did you do that?
 "MR. THOMPSON: Why did I do what? I thought it was a proper question.
"THE COURT: That is no —
 "MR. THOMPSON: She was just getting ready to identify the knife, Your Honor.
 "THE COURT: I tell you what, you sit down right there.
 "MR. THOMPSON: You know, she was going to identify —
 "THE COURT: You sit down right there and hush until I get through talking. Don't you ever do anything like that in my courtroom again. Now, you know better than to do that. You commented. *Page 1039 
Now, you will have an opportunity to argue the case. But that was not a question at all. And you're not to do that anymore in my courtroom. Do you understand?
"MR. THOMPSON: Yes, sir, Your Honor.
 "THE COURT: And do you understand that I will hold you in contempt of court if you pull a stunt like that again?
 "MR. THOMPSON: I understand that also, Your Honor, yes, sir.
 "THE COURT: Never. That's not zealousness, that is unprofessional conduct. And it's not to happen in my courtroom again.
"MR. THOMPSON: I understand, sir.
 "THE COURT: Okay. Now, what I'm referring to specifically is your comment about the knife that they've been parading around in front of the jury all of this time. Now, to my knowledge, there's been no objection made about anything that has gone on in the —
 "MR. THOMPSON: I've been objecting in the whole trial about that knife.
 "THE COURT: Not to the kind of thing that you're talking about, and I'm not going to put up with you doing that sort of thing. Now, the knife is admitted into evidence and has been admitted into evidence for some time in this trial. And it was properly admitted into evidence. And, for you to make a slurring remark about opposing counsel just is not a professional statement. Okay. Bring the jury out.
"(Jury present.)
 "THE COURT: Ladies and gentlemen, in the course of his interrogation, defense counsel made a remark which is not appropriate, and I'm going to ask you to disregard it. The function of counsel is to ask questions, and I will ask you to completely disregard his comment concerning evidence. And I will ask you to remember all of the evidence as you heard it and as you see it and base your verdict solely on the evidence in this case." (R. 185-188) (emphasis added).
Defense counsel continued his direct examination of the appellant concerning the circumstances surrounding her possession of the knife. The following occurred:
 "Q. [Mr. Thompson] Did you intend to kill Earl Knight?
"MR. HUNTLEY: Your Honor, I object.
"A. No.
 "Q. Were you fearful that they were going to harm you?
"MR. HUNTLEY: I object.
"A. Yes.
"THE COURT: I sustain the objection.
 "MR. HUNTLEY: Your Honor, would you ask the jury to disregard the — never mind.
 "Q. What were you thinking when Joann Cannon and Earl Knight approached you?
"MR. HUNTLEY: I object, Your Honor.
"THE COURT: I sustain the objection.
 "Q. What happened when they approached you? What were you thinking?
"MR. HUNTLEY: I object, Your Honor.
"MR. CLARK: Objection, Your Honor.
"THE COURT: Sustained.
 "MR. CLARK: Objection, because it assumes a fact not in evidence as well as — as to the —
 "Q. What were you thinking when she had the bottle in her hand?
"MR. HUNTLEY: I object.
"Q. What were you thinking when he hit you?
"MR. HUNTLEY: I object.
 "THE COURT: Are you going to give your witness a chance to answer any of those questions that you're asking?
"MR. THOMPSON: If the State permits.
 "THE COURT: Okay. I sustain the objection to each and every one of the questions. And let the Record show that the attorney rattled off those questions in such a fashion that he could not have been expecting an answer from the witness.
"A. I can't answer when they saying —
"MR. THOMPSON: Hold on.
 "(Bench conference held outside the hearing of the jury.) *Page 1040 
 "MR. THOMPSON: I would like to note on the Record that I object to the Court's last comment about question of counsel. It is for the State to object, what it did. And I did ask a question in hopes that my client would be able to answer the question. And I object, and I'll state that it prejudiced the jury. And I move for a mistrial.
"THE COURT: Okay. Take a seat back over there now.
"(Bench conference concluded; jury present.)
 "THE COURT: Okay. Ladies and gentlemen, it was the Court's impression that counsel asked questions in such a manner as simply to impress you with the question and that he asked those questions in such — so rapidly that he could not have expected the client to answer those questions. If I am in error, you be guided by your judgment in that regard. But I will ask you to completely disregard questions that are assumed to be — or that are stated in such a way as to try to present facts to you as opposed to eliciting testimony from the stand. If it is your impression that the attorney has done something in such a manner as to try to tell you something rather than have the witness tell you something, then you be guided simply by the testimony as it comes from the stand. You may proceed.
". . .
"Q. What were you thinking when this happened?
"MR. HUNTLEY: I object.
"THE COURT: I sustain — come around.
 "(Bench conference held outside the hearing of the jury.)
". . .
 "THE COURT: Okay. I'm going to overrule the objection.
 "MR. HUNTLEY: It is not a subjective determination. It's an objective determination based on our (inaudible) for that situation.
 "THE COURT: I think that you're probably right, but I do have some recollection that a person can testify as to their mental state under circumstances such as this. And I will admit that I'm going by the seat of the pants, but I'm going to give the defendant the doubt —
 "MR. HUNTLEY: Because it's difficult for us to cross examine her on what she thought.
 "THE COURT: I understand. I'm not going to let you go very far.
"(Bench conference concluded; jury present.)
 "Q. Okay. Refresh me as to where we were, Ms. Smith. You had indicated that — your testimony was that Earl Knight had slapped you. And I asked you what did you think when this happened, and you may answer that question now.
". . .
 "A. He was holding my wrist when he slapped me. And, by him holding my wrist and telling her that he was going to hold me and let her beat me while he was holding me, I was seared.
"Q. And what were you afraid of.
"A. My life." (R. 190-197) (emphasis added).
The appellant further contends that "[t]he record in the instant case is replete with innuendo and insinuations by the trial judge impugning the ability and integrity of appellant's trial counsel." (Brief of appellant p. 6).
It is clear, as the appellant points out in brief, that "[a] trial judge who uses language which tends to bring an attorney into contempt before the jury, or makes any intimation which tends to prejudice the attorney, commits reversible error."Gwin v. State, 425 So.2d 500, 507 (Ala.Crim.App. 1982), cert. denied, 425 So.2d 510 (Ala. 1983).
"A trial judge has a duty to be thorough, courteous, patient, punctual, just and impartial. Yet he is not required to be a 'Great Stone Face' which shows no reaction to anything that happens in his courtroom. Allen v. State, 290 Ala. 339,276 So.2d 583 (1973)." Gwin, supra at 506-507.
In upholding the appellant's conviction in Gwin, we stated: *Page 1041 
 "The record of the defendant's trial, upon which our review must be based, is composed only of the words which were spoken by the participants in the proceedings. It does not contain a description of the manner or attitude in which those words were spoken and does not directly reflect the demeanor of the parties. The trial judge was in the best position to observe the conduct of the parties and we must indulge the presumed correctness of his judgments in this regard. Jolly v. State, 405 So.2d 76 (Ala.Cr.App. 1981)."
Gwin, supra at 507.
We also recognized in Gwin.
 " 'The trial judge, as a natural consequence of his position and the many duties devolving upon him, is necessarily vested with much discretion in the conduct of the trial of causes, and, unless it clearly appears that there has been an abuse of this discretion, appellate courts will not interfere to control such discretion, but will presume that one occupying so important a position as that of circuit judge will accord to all litigants in his court the fair and impartial trial provided for in the Constitution of this state.' "
Gwin, supra at 507 (quoting Dennison v. State, 17 Ala. App. 674,676, 88 So. 211 (1921)).
Faced with a similar contention in Cox v. State,489 So.2d 612 (Ala.Crim.App. 1985), we stated, " '[r]emarks by the trial judge may be open to criticism, but they are not error unless they have affected the result of the trial.' " Cox, supra at 623 (quoting McCovery v. State, 365 So.2d 358, 362
(Ala.Crim.App. 1978)). See also Jones v. State,398 So.2d 360, 367 (Ala.Crim.App.), cert. denied, 398 So.2d 369 (Ala. 1981), wherein we stated:
"A judge is not to be severely criticized for his pointedly bringing the bad habit to the attention of an attorney."Sprinkle v. State, 368 So.2d 554 (Ala.Crim.App. 1978), cert. quashed, 368 So.2d 565 (Ala. 1979), and cases cited therein;Smith v. State, 447 So.2d 1327 (Ala.Crim.App. 1983), aff'd,447 So.2d 1334 (Ala. 1984). Cf. Daniel v. State, 41 Ala. App. 405, 134 So.2d 752, cert. denied, 273 Ala. 706, 134 So.2d 757
(1961); Neal v. State, 36 Ala. App. 156, 54 So.2d 613, cert. denied, 256 Ala. 373, 54 So.2d 616 (1951); Williams v. State,34 Ala. App. 253, 39 So.2d 29, rev'd on other grounds, 251 Ala. 397, 39 So.2d 37 (1948), cert. denied, 251 Ala. 696,39 So.2d 39 (1949).
We have carefully examined the entire record as well as the specific incidents pointed out in brief with respect to the appellant's contentions. We conclude that, under the circumstances, the various comments made by the trial judge did not deny the appellant a fair and impartial trial.
A review of the record reveals that the emotional involvement of the witnesses and spectators during trial made an already difficult task for the trial judge even more so.
However, in light of the entire record of this case, we find that the substantial rights of this appellant have not been adversely affected. Lowe v. State, [1987], Alabama Supreme Court, 514 So.2d 1049.
 II
The appellant contends that the trial judge erred in questioning State's witness Henry Peavy "after the conclusion of direct examination, but before cross examination." (Brief of appellant p. 7).
Mr. Peavy was a detective with the Tuskegee, Alabama Police Department on the night in question. He received the knife used in the stabbing from Sgt. Pollard shortly after the incident occurred.
Sgt. Pollard was one of the officers responsible for apprehending the appellant. Pollard had testified earlier that he took the knife from the appellant's hand after the stabbing and later gave it to Mr. Peavy.
During Mr. Peavy's testimony concerning the knife, the following occurred:
 "Q. [Mr. Huntley] Detective Peavy, I'm going to hand you what's been marked as State's Exhibit Number 5 and ask you if you can identify that?
"A. Yes, I can.
"Q. What is that, sir? *Page 1042 
 "A. That is the knife that Sergeant Pollard turned over to me the night of the incident.
 "Q. And how are you able to recognize that as the knife?
 "A. Because of the blood stains that was on it at the time and the shape of the knife and the compass, the compass that's in the end of it.
 "Q. What, if anything, did you do with that knife once it was turned over to you?
 "A. I kept it in my possession until July 24th, 1985. Carl Murdock from the Department of Forensic Science came to pick up the body of Mr. Knight. At that time, I turned over to him the evidence given to me by Sergeant Pollard.
"Q. What evidence did that include?
 "A. The body of Mr. Knight, the survivor knife, two tubes of blood and a sweatshirt.
 "Q. Now. Detective Peavy, is that knife in substantially the same condition now as it was when you received it from Sergeant Pollard?
"A. Yes, sir, it is.
 "Q. And where has that knife been since that occasion?
 "A. I gave it to Mr. Murdock. And, approximately two months ago, I received it back from the Department of Forensic Science through the mail. It's been in my possession since that time.
"Q. And who is Carl Murdock?
 "A. He works for the Department of Forensic Science.
"Q. Do you know what he does?
"A. He transports bodies.
 "Q. And is that knife in substantially the same condition now as when you received it back —
"A. Yes, sir, it is.
"Q. — from the Department of Forensic Science?
"A. Yes, sir, it is.
 "THE COURT: Can you recognize the knife as such, you know, as being the same knife that you saw that night?
 "THE WITNESS: Yes, sir. When it came back to me, it was in the same package that I sent it to the lab in.
 "THE COURT: Is the knife — would you describe it as being a common knife, or is it unusual?
"THE WITNESS: It's an unusual knife, Judge.
"THE COURT: Tell us how it is unusual.
 "THE WITNESS: Because of the ridges on there and the circumference in the end. Most knives do not have that — plus it's camouflage. Most knives do not have that.
 "THE COURT: You're referring to the handle. Would you describe it as a large green handle with black on it similar to what camouflage material looks like?
"THE WITNESS: Yes, sir, I would.
 "THE COURT: Is there a bottle opener also in the blade of the knife?
 "THE WITNESS: Is there a bottle opener in the blade of the knife? Yes, sir, there is.
 "MR. HUNTLEY: May we approach the bench, Your Honor?
 "(Bench conference held outside the hearing of the jury.)" (R. 136-139).
The knife was subsequently admitted into evidence over the appellant's objection based on the ground that the State had failed to establish the chain of custody. (R. 139-142).
The trial judge did not abuse his discretion in questioning this witness concerning the knife. Hinkle v. State, 50 Ala. App. 215, 278 So.2d 218 (1973); Brandes v. State, 17 Ala. App. 390,85 So. 824 (1920); Sprinkle, supra. The following quote fromBrandes, supra is applicable here:
 " '. . . The unquestioned province of the court — in fact, the solemn and sacred duty of a trial judge — is the development and establishment of the truth, and in this connection it is always permissible for the court and if it appears necessary for him to do so it is his duty, to propound to witnesses such questions as it is deemed necessary to elicit any relevant and material evidence, without regard to its effect, whether beneficial to the one party or the other. Beal v. State, 138 Ala. 94, 35 So. 58. In fact, it *Page 1043 
is a sacred duty of a judge, both in civil and criminal cases, to give strict attention to the evidence, and to all facts and incidents attendant upon the trial, to propound questions to witnesses if in his judgment he deems it necessary, and to supervise and control the proceedings before him, with a view that justice may not miscarry.' "
Hinkle, supra at 220, 278 So.2d 222. (emphasis added).
The information elicited by the trial judge was certainly relevant and material. The questions were asked for the purpose of establishing the unique characteristics of the murder weapon so that the chain of custody could be proved.
The appellant cites Richardson v. State, 403 So.2d 293
(Ala.Crim.App.), aff'd, 403 So.2d 297 (Ala. 1981), in support of her contentions. There, however, the questions asked of the appellant by the trial judge prejudiced the appellant's claim of self-defense and were not of the same nature as those in the case at bar. The improper questioning which occurred inRichardson, supra and the other cases cited by the appellant, is not similar to the questions propounded by the trial judge in this case, which were asked, here, solely for the purpose of establishing the chain of custody of the murder weapon.
We note that in Cook v. State, 36 Ala. App. 449, 57 So.2d 832
(1952), cited by appellant, the court specifically states:
 "In the case at bar we do not conclude that reversible error should be predicated on the sole fact that the judge did propound many questions to witnesses. Our view, however, forces the conclusion that this frequent practice magnified and enlarged the significance and possible injurious effect of the judge's statements to counsel. The statement was: 'Mr. Selman, is it your contention that you don't want all the evidence brought out —.' " Cook, supra at 451, 57 So.2d 832 (emphasis added).
We find no error here.
 III
The appellant contends that the trial judge erred in "taking judicial notice that the alleged murder weapon was unique for purposes of establishing chain of custody." (Brief of appellant p. 8). She argues that there "was no evidence from the witness stand supporting the court's theory." We disagree.
We note at the outset that the appellant has offered no legal authority in support of this contention. We are not obligated to consider her argument on appeal. Vinzant v. State,462 So.2d 1037 (Ala.Crim.App. 1984); Johnson v. State, 500 So.2d 494
(Ala.Crim.App. 1986). Nevertheless, we have considered her contention and find it to be without merit.
It is well-settled that the chain of custody need not be proved to an absolute certainty; a reasonable probability is sufficient. Gwin, supra at 508. The purpose of establishing a chain of custody is to show that the evidence has not been tampered with. Gwin, supra.
We believe that sufficient evidence was presented through the testimony of Sgt. Pollard (R. 76-81) and Ms. Peavy (R. 136-139) to prove the chain of custody, especially in light of the evidence presented as to the unique characteristics of the weapon involved. (R. 78-79, 137-139). See Hoyett v. State,441 So.2d 1063 (Ala.Crim.App. 1983). We find no error here.
 IV
The appellant contends that the trial court erred in admitting Randolph Crawford's testimony concerning the statement that she made on the night of the stabbing (i.e., that she was going to kill someone). (R. 173-174). She argues that the statement was inadmissible hearsay and does not fall within an exception to the hearsay rule.
The appellant has, once again, failed to provide this court with legal authority in support of her contentions.Vinzant, Johnson, supra. Once again, we have considered her contentions in spite of her omission, and find them to be without merit. *Page 1044 
It is well-settled that: "[a] statement by the accused, before the time of the alleged criminal act, asserting a design or emotion in him which points to his guilt is admissible against him as an admission." C. Gamble, McElroy's AlabamaEvidence § 264.01(1) (3rd ed. 1977) (emphasis added). See Smootv. State, 381 So.2d 668 (Ala.Crim.App. 1980) ("the acts, declarations and demeanor of an accused before or after the offense whether a part of the res gestae or not are admissible against him, but unless a part of the res gestae are not admissible for him").
Furthermore, this court has held that "[h]earsay does not include statements of witnesses in the present trial subject to cross-examination by the party against whom the statements are offered." Reeves v. State, 456 So.2d 1156 (Ala.Crim.App. 1984). We hold, therefore, that the trial judge committed no error in admitting Crawford's testimony concerning the appellant's statement.
 V
The appellant contends that the trial court erred in allowing the State on cross-examination to require that defense witness Ossie Cardwell stand up and identify his sister as being seated next to the appellant's mother during the trial. (R. 236239). She argues that the procedure was an improper method of showing the witness' bias and constituted prejudicial error. She also contends that "a proper predicate for introducing evidence of bias was not laid." (Brief of appellant p. 9).
The appellant's contentions are without merit. It is clear that a witness may be impeached on cross-examination by asking him about particular relationships that would reveal that he is biased. Gamble, supra § 149.01(5), and (9). It is also clear that "asking the witness about the state of his feelings is not a condition precedent to the right to ask him about any particular bias revealing circumstances." Gamble, supra § 149.01(5) (emphasis added).
Because this evidence had a tendency to show the amicable relationship between the witness' family and the appellant's family, we hold that it was properly admitted as showing the witness' bias against the State. See Nichols v. State, 276 Ala. 209, 160 So.2d 619 (1964). Although the manner by which the State chose to prove the witness' bias was somewhat unusual, we find no abuse of the court's discretion in permitting the use of this procedure. See Nichols, supra.
For the above-stated reasons this cause is due to be and is, hereby, affirmed.
AFFIRMED.
All the Judges concur.
 *Page 148