Appellant Leonard Lynn Peevy was the tax collector of Escambia County, Alabama. He was accused of the systematic conversion of public funds after an audit revealed a pattern of theft. The authorities were alerted to the need for a cash audit after it came to their attention that the appellant had transferred $23,000 in personal funds back into the tax collector's official bank account. A cash audit indicated that $48,765.55 had been collected by the tax collector but could not be accounted for as of the final date covered by the audit. A full investigation by the state indicated that over $51,000 in currency had been deposited in the appellant's personal bank accounts during the same period. The appellant then proceeded to eliminate the $48,000 shortage by transferring money from his personal bank accounts into his official tax collector's account.
Under the provisions of § 40-5-36, Code of Alabama 1975, the duty of a county tax collector is to collect tax money and pay it out on the first and fifteenth days of each month. On the days he pays out, the tax collector issues a report to the state treasurer, county treasurer, and school board treasurer, telling them how much he has collected for them during the pay period. Disbursement to these agencies must be made within five days of issuing the reports of collections. The tax year begins on July 1 of each year, and the tax collector must make a final settlement with all tax recipients by that time, according to the provisions of § 40-5-44, Code of Alabama 1975. This final settlement date makes allowance for payment of balances due as a result of late taxes collected, property reappraised and other reasons. The two principal sources of tax money are ad valorem tax on real estate and ad valorem tax on motor vehicles. The tax collector is advised by the tax assessor as to how much is to be paid and has the duty of collecting the figure as reported to him. Receipts were made in the appellant's office for all tax money paid over the counter. At the end of each business day the receipts in the collector's office were to be checked and totaled and then balanced with the amount of money received. The money was placed in an office vault or safe until deposited in the bank. Only the appellant and the chief clerk had keys to the vault.
The official bank account for the appellant's office was under the name, "Leonard Peevy, Tax Collector, Escambia County, Alabama," in the First Progressive Bank of Brewton, Alabama. This was the only official bank account, except for a small refund account which did not have any money in it at the close of the audit.
During the audit period, contrary to established procedure, daily deposits were not made to this account. Cash was left in the office vault over a period of several days.
In actual practice the appellant also delayed his disbursements. The auditors could not say how much money had been collected during any given month during the period audited, because the receipts were not totaled from day to day. Appellant had access to large amounts of cash over periods of several months by virtue of these variances from statutory procedure. *Page 250 
The appellant had two other bank accounts. Both were personal checking accounts in the name of "Leonard L. or Lucille B. Peevy." One was with the First Progressive Bank and the other at the Bank of Brewton. The Peevys' home address and phone number were on these accounts. Appellant deposited $51,298.70 into these two accounts during the twenty-one month audit period in addition to his and his wife's salaries and other accountable income with which the funds were comingled.
The State Department of Examiners of Public Accounts, during a routine annual audit in May 1982, noticed that a cashier's check payable to the appellant for over $23,000 had been deposited into the tax collector's official account on June 30, 1981. This had been done so that appellant could make final settlement with the state and county at the end of that tax year. This was the only deposit to that account of non-tax money. The examiners also discovered that the collections of the tax collector's office were over $19,000 more than the deposits for the same period. This audit was concluded around June 24, 1982, and an "exit conference", a standard procedure, was had by Mr. Warren Folmar of the Department of Examiners of Public Accounts and the appellant, to discuss the audit findings. Folmar testified that at this conference the appellant stated that he had personally taken out a loan for the $23,000, that he deposited the proceeds into the official tax collector's account because his chief clerk had told him the office was short by that sum.
This was the "red flag" which led to further investigations. Folmar then proceeded to conduct a cash audit. This time, he examined the bundles of paid receipts for a period October 9, 1980, through June 30, 1982. These receipts showed how much money was paid over the counter during that time. The procedure employed by the examiners was not actually to read each of the 100,000 receipts, but rather to closely scrutinize the tapes as to each bundle of receipts and assure that each amount was correct when taken from the corresponding receipt. Only when there were indications of discrepancy would the auditor physically run another tape on that group of receipts. He did, in fact, recalculate approximately 30,000 receipts.
As of the closing date of the time span covered by the audit, $51,765.27 should have been either in the tax collector's account in the bank or on hand. Only $1,978.72 could be accounted for. Approximately $48,765.55 in tax collections was not accounted for. At the conclusion of this audit, the auditor had another conversation with Tax Collector Peevy, who at this time made a statement to him that he had been "putting the money back in dribbles." Peevy then stated that since the shortage in money had been uncovered, he "might as well put it all back at once." Appellant began replacing money in the official tax collector's bank account so that by the end of August 1982, no shortage existed. Approximately $47,000 that was deposited into the tax collector's account was not attributable directly to tax collections, but rather to transfers from Peevy's personal bank accounts.
On September 29, 1982, at the exit conference regarding the findings of the case audit, Warren Folmar, Frank Brooks, and Holcomb Kerns of the Department of Examiners of Public Accounts were present. Mr. Peevy at this conference, made a statement that he had used the money from the tax collections to repay a personal loan in the approximate amount of $23,000. He said that the money he got from this loan had been deposited into the official tax collector's account to satisfy an earlier shortage.
Other state's evidence tended to indicate that the appellant had repaid a $10,000 personal note in cash during the time period covered by the audit. Appellant had made large deposits of cash to his other bank accounts. The president of the First Progressive Bank of Brewton testified that the appellant had borrowed $134,408.28 from October 1980 through June 1982 from his bank, of which he had repaid about *Page 251 
$65,379.80. The proceeds of one of these loans taken out by Peevy were used to purchase the $23,000 cashier's check which he deposited into the Escambia County Tax Collector's account on June 30, 1981. Additional testimony indicated deposits of large sums of cash into Peevy's personal checking account at the First Progressive Bank.
The defense in this case was the contention that a deposit into the other bank accounts of the appellant should be treated as a deposit into the tax collector's account rather than a conversion of public funds to private use.
 I
Appellant first contends that the court erred in permitting the state's attorneys and witnesses to characterize the bank accounts as "official accounts" and "personal accounts" and bank transactions as "personal" or "official." Peevy also objects to the use of the phrase "putting money back." The essence of this case involves the alleged conversion of public funds to private use. It was, therefore, necessary for distinctions to be made among the different bank accounts. On the one hand, there existed the account maintained by the tax collector's office. On the other hand, there existed personal checking accounts in the name of the appellant and his wife with their home address and telephone number.
These characterizations of the bank accounts, in order to constitute reversible error, must be unsupported by any evidence. During the examination of Mrs. Merilie Booker, a 36-year veteran employee of the tax collector's office and chief clerk, the following evidence was adduced:
 "Q: (MR. WASDEN): Mrs. Booker, how long have you worked for the Tax Collector's office here in Escambia County?
"A: Thirty-six years.
 "Q: How many tax collectors have served in office while you have been working in that office?
"A: Five.
"Q: Does that include Mr. Peevy?
"A: Yes.
"Q: He is the fifth then.
"A: Yes.
"Q: Who were the previous four, if you can recall?
 "A: Mr. G.S. Byrne; Mr. J.R. Roby; Mr. White; Mrs. White and Mr. Peevy.
 "Q: Mr. Peevy. What were your responsibilities under the first four? What did you do in the office under those tax collectors generally?
 "A: Generally, I did everything that came at hand. I did receipts, made reports and accepted money, made deposits and everything.
". . .
 "Q: When you say `deposits,' Mrs. Booker, what are your speaking of? Deposits of what to what?
"A: Money to the bank.
"Q: What kind of money, Mrs. Booker? Tax Collections?
"A: Tax Collector's money.
 "Q: What account at the bank do you deposit this money in?
"A: To the Tax Collector's account.
 "Q: Does the Tax Collector maintain an official Tax Collector's account?
"A: Yes, he does.
 "Q: And how many official Tax Collector's accounts does the Tax Collector maintain?
"A: One account.
 "Q: And who does the money in this account belong to, Mrs. Booker?
 "A: It belongs to the County or the different . . . not the County but the individuals that it goes to.
 "Q: I think I can get it out better this way. Do you draw checks on this account?
"A: Yes.
"Q: And who else writes checks on this account?
"A: Mr. Peevy.
 "Q: And who all do you write checks on this account to? Who do you send money to?
 "A: The state; county; to the hospital; to the cities, four cities, and to the schools and courthouse. *Page 252 
 "Q: How often do you pay out money out of this account, Mrs. Booker?
"A: Twice a month."
Another witness, Mr. Edwin Wells, president of the First Progressive Bank of Brewton, testified, in part, as follows:
 "Q: Mr. Wells, I am not sure we made this clear the first time. These checks, State's Exhibit 4, what account were they drawn on?
 "A: They were drawn on Leonard L. or Lucille B. Peevy's personal account number 11-052-46.
"Q: Made out to whom?
"A: Leonard Peevy, Tax Collector.
"Q: What account were they deposited into?
"A: In the official account, Tax Collector's account.
 "Q: In the official Tax Collector's account of Leonard Peevy, Escambia County?
"A: Yes.
"MR. ANDERSON: That is all."
It has long been the rule in this state that in their closing arguments, counsel are permitted wide latitude in drawing reasonable inferences from the evidence. Manigan v. State,402 So.2d 1063 (Ala.Crim.App.), writ denied, Ex parte Manigan,402 So.2d 1072 (Ala. 1981), states, "To constitute reversible error, the statement of counsel in argument must be made as a fact which is unsupported by any evidence, and the argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury." 402 So.2d at 1072 (emphasis in original) [court citing Flint v.State, 370 So.2d 332 (Ala.Crim.App. 1979)].
The same principles should be applied to a reference or characterization by counsel in the course of the trial. We recognize the appellant's defense was to deny any distinction between his personal checking account and the tax collector's account. The characterization employed by the prosecutors was supported by facts in evidence as set out above. The facts could hardly have been presented to the jury without distinguishing between the various bank accounts. No error occurred in this respect.
 II
Appellant next contends that the court erred in admitting into evidence the "special cash audit" report. We cannot agree.
The audit report was sworn to and certified to be true and correct by field auditor Warren Folmar and by Ronald L. Jones, Chief Examiner of the Department of Examiners of Public Accounts. The audit report included the statement that the appellant had used tax funds to pay a personal loan. The report states, "When the deposit and loan were discussed with the Tax Collector, he stated that the money was deposited in order to have sufficient funds to make the final settlement and that the loan was repaid in part from tax collections in the succeeding tax year." This was a finding made under oath by the auditors and as such was admissible as part of the report.
The audit report was prepared pursuant to § 41-5-21, Code of Alabama 1975, which states in this regard that "such reports shall be public records, and prima facie evidence of what they charge." In Chambers v. State, 352 So.2d 21 (Ala.Crim.App. 1977), introduction of a copy of such a report was unsuccessfully challenged.
 III
Peevy asserts that statements made by him to the auditor were improperly received into evidence. He contends specifically that he was not informed of his constitutional rights as required by the Supreme Court in Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The state argues in turn that the Miranda warnings are not required in a non-custodial circumstance, citing Beckwith v. United States,425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). In Beckwith, Internal Revenue Service agents interviewed a taxpayer at his office and at his home regarding potential criminal income tax violations. A criminal *Page 253 
investigation admittedly had already commenced at the time of the interview. The court stated:
 "The interview with the government agency in a situation such as the one shown by this record simply does not present the elements which the Miranda court found so inherently coercive as to require its holding. Although the `focus' of an investigation may indeed have been on Beckwith at the time of the interview in the sense that it was his tax liability which was under scrutiny, he hardly found himself in the custodial situation described by the Miranda
court as the basis for its holding. Miranda
specifically defined `focus', for its purposes, as `questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' 384 U.S. at 444, 16 L.Ed.2d 694, 86 S.Ct. 1602."
Similarly, in United States v. Wright, 685 F.2d 142, 143 (5th Cir. 1982), the Fifth Circuit Court of Appeals observed:
 "[M]oreover, the IRS agents conducted their interview in surroundings familiar to Wright and there is no evidence that the agents restrained or coerced him in any way. Wright accompanied the agents freely to the office, was questioned for only an hour, and then left. On these facts, the district court properly determined that Miranda was inapplicable. . . ." (citing cases)
The conversations here took place at the Escambia County Courthouse, some in the appellant's own office. He was not in custody. He was not otherwise deprived of his freedom of action in any significant way. Miranda does not apply to the "exit conferences" in this case. The statements by appellant Peevy to the auditors were properly admissible into evidence.
 IV
Appellant next asserts that the court erred in refusing his requested charge as to the definition of the word "deprived". The trial court instructed the jury on both counts of the indictment. The first count charged theft of property in the first degree, in violation of § 13A-8-3, Code of Alabama 1975. The second count charged an ethics violation as proscribed by §36-25-5, Code of Alabama 1975. A second indictment was returned against Peevy for misapplication of property, in violation of §13A-9-51. The refused charge stated:
 "The court charges the jury that in order to convict the defendant, Leonard Peevy, of theft that you must be convinced beyond a reasonable doubt to a moral certainty that he obtained the property of another with the intent permanently to withhold that property."
This charge the trial court properly refused. We find this charge to be defective in that there are ways to deprive someone of property other than by withholding it permanently. The statutory definition, § 13A-8-1 (2), Code of Alabama 1975, is:
 "a. To withhold property or cause it to be withheld from a person permanently or for such period or under such circumstances that all or a portion of its use or benefit would be lost to him; or
 "b. To dispose of the property so as to make it unlikely that the owner would recover it; or
 "c. To retain the property with intent to restore it to the owner only if the owner purchases or leases it back, or pays a reward or other compensation for its return; or
 "d. To sell, give, pledge, or otherwise transfer any interest in the property; or
 "e. To subject the property to the claim of a person other than the owner."
 V
Peevy next asserts error by the trial court in denying his motion to consolidate the felony charges and the misdemeanor indictment in this case. The motion was made when the trial proceedings began. Rule 15.3 (b), Temp.A.R.Cr.P., requires that in a motion for consolidation the court "may, not later thanseven days prior to trial, order that the charges be tried together *Page 254 
if the offenses could have been joined in a single indictment. . . ." Appellant's motion was untimely and the court did not err in denying it. We note that at trial, no written charges were requested with regard to the misdemeanor charge of misapplication of property. Counsel stated "satisfied" with the jury instruction except for the objection dealt with above.
 VI
Appellant finally contends that the state failed to prove a prima facie case. A fair capsule of the state's evidence is that it tended to show the following:
 1. A cash audit covering the period of 10-9-80
through 6-30-82, revealed the tax collector's official account short by over $48,000.
 2. During the same 21-month period, over $51,000 cash was deposited to the appellant's two personal checking accounts without any source being shown for this money.
 3. After appellant was informed of the amount of the shortage and the audit was finished, the appellant transferred over $47,000 of funds from his personal accounts back into the tax collector's official account within six weeks.
 4. The appellant admitted that he had taken out a personal loan and placed the loan proceeds in the official account in order to effect a final settlement of the official account for that year. He also admitted that he had taken current tax collections back out of the official account in order to repay the loan. The loan note and the proceeds check were both introduced into evidence.
 5. Appellant admitted to the auditors that he was putting the money back in dribbles and that since the shortage had been revealed, that he might as well put it all in at once.
 6. The appellant was shown to have incurred substantial indebtednesses during the audit period for reasons unknown.
 7. The appellant was shown to have been one of only two people who had access to the office vault where the cash money was kept.
We think a prima facie case was made against the tax collector and the case properly submitted to the jury, who collectively rejected his defense.
The judgment of the trial court is due to be affirmed.
AFFIRMED.
All the Judges concur.