The appellant, Jonetta Finch, was indicted for theft of property in the first degree, as proscribed by § 13A-8-3, Code of Alabama 1975; more specifically, the theft by deception of $15,000, the property of the City of Roanoke. A jury found Finch guilty, as charged, and she was sentenced to eight years' imprisonment and ordered to pay $86,300 in restitution.
 I
Finch, who is black, first contends that the trial court erred in denying her motion to dismiss the selected petit jury on the ground that the prosecution used its peremptory strikes to remove members of her racial group from the jury, in violation of the Equal Protection Clause. In presenting his motion, defense counsel stated the following:
 "Your Honor, for the sake of the record, we would like to object to the composition of the jury based on the *Page 865 
exclusion of — based on the composition of the jury, the defense would like to object to the composition of the jury racially. We feel like that blacks have been excluded on a systematic basis.
". . .
 "We also ask that we be allowed to strike another jury."
In applying the principle of Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), we are aided by the following guidelines set forth in Ex parte Branch, [Ms. 86-500, September 18, 1987] (Ala. 1987).
 "The burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination. In determining whether there is a prima facie case, the court is to consider 'all relevant circumstances' which could lead to an inference of discrimination. See Batson, 476 U.S. at [94], 106 S.Ct. at 1721, citing Washington v. Davis, 426 U.S. 229, 239-42 [96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597] (1976). The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
 "1. Evidence that the 'jurors in question share[d] only this one characteristic — their membership in the group — and that in all other respects they [were] as heterogeneous as the community as a whole.' [People v.] Wheeler, 22 Cal. 3d [258,] 280, 583 P.2d [748,] 764, 148 Cal Rptr. [890,] 905 [(1978)]. For instance 'it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,' Wheeler, 22 Cal.3d at 280, 583 P.2d, at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
 "2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson, 476 U.S. at [97], 106 S.Ct. at 1723.
 "3. The past conduct of the offending attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)].
 "4. The type and manner of the offending attorney's questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at [97], 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
 "5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla. Dist. Ct. App. 1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
 "6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 352 and 355.
 "7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
 "8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at [93], 106 S.Ct. at 1721, Washington v. Davis, 426 U.S. at 242
[96 S.Ct. at 2049].
 "9. The offending party used peremptory challenges to dismiss all or most black jurors, but did not use all of his peremptory challenges. See Slappy, 503 So.2d at 354, Turner, supra." (Footnore omitted.)
In the present case, Finch has failed to establish a prima facie case of discrimination. We have no evidence before us to raise the inference of discrimination; rather, *Page 866 
we have counsel's mere assertion that they "feel like that blacks have been excluded on a systematic basis." We have no evidence of a pattern of strikes against blacks, past conduct of the prosecutor in exercising strikes, or any characteristics of the venire persons excluded from jury service. Moreover, the record does not contain a transcription of each attorney's voir dire questions. In fact, the record does not disclose how many blacks were on the venire; how many remained on the jury; and how many were excluded by prosecutorial strikes. While Finch's counsel asserts, in brief, that the prosecution struck all blacks from the jury, and counsel attached an affidavit to that effect, we cannot consider any matter not shown on the record.Ex parte Beck, 485 So.2d 1207 (Ala. 1985); Ex parte Olson,472 So.2d 437 (Ala. 1985).
We find apropos the following discussion in Swain v. State,504 So.2d 347, 350-51 (Ala.Cr.App. 1986):
 "Other than the bare allegation of defense counsel, there is nothing in the record to indicate that the prosecutor struck the thirteen blacks from the jury panel on the basis of race. 'This court cannot find systematic exclusion of blacks based on a mere allusion.' People v. Peters, 144 Ill. App.3d 310, 98 Ill. Dec. 731, 494 N.E.2d 853, 862 (1986). 'While the Supreme Court declined "to formulate particular procedure[s] to be followed upon a defendant's timely objection to a prosecutor's challenges," Batson, [476] U.S. at [99], 106 S.Ct. [at] 1724, we cannot read the opinion to require a prosecutor to explain his right of peremptory challenges upon a defendant's mere objection to a jury and unsubstantiated claims of discrimination.' Weekly v. State, 496 N.E.2d 29, 31 (Ind. 1986) (general objection without reason; number and race of stricken jurors unknown). In Sashner v. State, 500 So.2d 1322
(Ala.Cr.App. 1986), we held that 'the mere allegation that the prosecutor "used all her strikes to try eliminate all of the blacks off the jury" does not constitute a prima facie showing of discriminatory selection of the venire.'
 "The removal of blacks by the use of peremptory challenges does not, by itself, raise an inference of racial discrimination. Phillips v. State, 496 N.E.2d 87, 89 (Ind. 1986).
 " 'Under Batson, the prosecution must necessarily exercise its strikes to enable the defendant to make a prima facie showing that the strikes were used in a racially discriminatory fashion. Appellant's argument presumes that the state will act with this purpose. This argument misplaces the burden of proof. The Supreme Court clearly stated in Batson that, as in any equal protection case, the burden is on the party alleging the discriminatory action to prove the existence of a racially discriminatory purpose.
 'There still exists, at least initially, a presumption that the state has exercised its peremptory challenges with a neutral purpose, though now it is a realistically rebuttable one. Batson does not require the state to provide a benign justification for peremptorily striking Blacks from a petit jury absent a prima facie showing by the defendant that the strikes were made solely on the basis of race.' Williams [v. State], 712 S.W.2d [835,] 840-41 [(Tex. Dist. Ct.App. 1986)]."
 II
In presenting evidence that Finch obtained funds from the City Utilities Board by misusing her position as assistant clerk, the prosecution introduced Finch's oral confession to stealing the money and her following written confession:
 "By means of using computer, posting payments without print out[,] I've taken approx. amount of 80,000.00 only to be determine[d] with figures provided by myself within a day or two. Over a period of a year. Beginning about January 1984. All in cash only."
This confession was signed by Finch and witnessed by Henry Bonner, Mayor of the City of Roanoke, and W.E. Montgomery, Jr., Chairman of the Utilities Board. *Page 867 
Finch contends that the trial court erred in denying her motion to suppress her confession[1] because, she argues, her confession was given without the warnings mandated by Mirandav. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, compliance with the procedural safeguards of Miranda
is not necessary unless the confession is a product of "custodial interrogation" or "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444, 86 S.Ct. at 1612 (footnote omitted). "It is settled that the safeguards prescribed byMiranda become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " Berkemer v. McCarty, 468 U.S. 420, 440,104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (quoting California v.Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520,77 L.Ed.2d 1275 (1983) (per curiam)). The Supreme Court reiterated the reasons for the Miranda safeguard in Minnesota v. Murphy,465 U.S. 420, 429-30, 104 S.Ct. 1136, 1143-44, 79 L.Ed.2d 409
(1984), as follows:
 "Not only is custodial interrogation ordinarily conducted by officers who are 'acutely aware of the potentially incriminatory nature of the disclosures sought,' Garner v. United States, [424 U.S. 648], at 657 [96 S.Ct. 1178 at 1184, 47 L.Ed.2d 370] [1976], but also the custodial setting is thought to contain 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' Miranda v. Arizona, 384 U.S., at 467 [86 S.Ct. at 1624]. See Schneckloth v. Bustamonte, 412 U.S. 218, 246-247
[93 S.Ct. 2041, 20572058, 36 L.Ed.2d 854] (1973). To dissipate 'the overbearing compulsion . . . caused by isolation of a suspect in police custody,' United States v. Washington, 431 U.S. 181, 187, n. 5, [97 S.Ct. 1814, 1819 n. 5, 52 L.Ed.2d 238] (1977), the Miranda Court required the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it. 384 U.S., at 467-469, 475-477
[86 S.Ct. at 1624-1625, 1628-1629]. We have consistently held, however, that this extraordinary safeguard 'does not apply outside the context of the inherently coercive custodial interrogations for which it was designed.' Roberts v. United States, 445 U.S. [552], at 560 [100 S.Ct. 1358 at 1364, 63 L.Ed.2d 622] [1980]."
It is the compulsive aspect of custodial interrogation, and not the strength or content of the officer's suspicions at the time the questioning was conducted, which led the Court to impose the Miranda requirements with regard to custodial questioning. Beckwith v. United States, 425 U.S. 341, 346-47,96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976). The Court has "explicitly recognized that Miranda warnings are not required '. . . because the questioned person is one whom the police suspect.' " California v. Beheler, 463 U.S. at 1125,103 S.Ct. at 3520 (quoting Oregon v. Mathiason, 429 U.S. 492, 495,97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)). As the Court noted inBeckwith v. United States, 425 U.S. at 347, 96 S.Ct. at 1616, "Miranda implicitly defined 'focus,' for its purposes, as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' 384 U.S., at 444
[86 S.Ct. at 1612]. (Emphasis supplied.)" Moreover, in Beckwith v.United States, 425 U.S. at 345, 96 S.Ct. at 1615, the Court rejected the notion that "psychological restraints" arising from being the "focus" of investigation are "the functional, and, therefore, the legal, equivalent of custody." See alsoMinnesota v. Murphy, 465 U.S. at 431, 104 S.Ct. at 1144; Patev. State, 492 So.2d 1026 (Ala.Cr.App. 1986); Fain v. *Page 868 State, 462 So.2d 1054, 1056 (Ala.Cr.App. 1985).
Moreover, the Supreme Court has ruled, in Oregon v.Mathiason, that custody does not result simply because the suspect is questioned in a "coercive environment." InCalifornia v. Beheler, 463 U.S. at 1123-24,103 S.Ct. at 3519-20, the Court summarized the factual situation and its holding of Oregon v. Mathiason, as follows:
 "In Oregon v. Mathiason, . . . we held that the suspect was not 'in custody' within the meaning of Miranda. The police initiated contact with Mathiason, who agreed to come to the patrol office. There, the police conducted an interview after informing Mathiason that they suspected him of committing a burglary, and that the truthfulness of any statement that he made would be evaluated by the District Attorney or a judge. The officer also falsely informed Mathiason that his fingerprints were found at the scene of the crime. Mathiason then admitted to his participation in the burglary. The officer advised Mathiason of his Miranda
rights, and took a taped confession, but released him pending the District Attorney's decision to bring formal charges. The interview lasted for 30 minutes.
 "In summarily reversing the Oregon Supreme Court decision that Mathiason was in custody for purposes of receiving Miranda protection, we stated: 'Such a noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." ' 429 U.S., at 495
[97 S.Ct. at 714]. The police are required to give Miranda warnings only 'where there has been such a restriction on a person's freedom as to render him "in custody." ' 429 U.S., at 495 [97 S.Ct. at 714]. Our holding relied on the very practical recognition that '[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.' Ibid." (Footnote omitted.)
As the Court noted in Minnesota v. Murphy, 465 U.S. at 430,104 S.Ct. at 1144, "custody for Miranda purposes has been . . . narrowly circumscribed." "Fidelity to the doctrine announced inMiranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." Berkemer v. McCarty,468 U.S. at 437, 104 S.Ct. at 3148. In applying the narrow standard appropriate in the Miranda context, we are directed by the following:
 "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of a degree associated with a formal arrest."
California v. Beheler, 463 U.S. at 1125, 103 S.Ct. at 3520
(quoting Oregon v. Mathiason, 429 U.S. at 495,97 S.Ct. at 714)). See also Hooks v. State, [Ms. 3 Div. 282, March 10, 1987] (Ala.Cr.App. 1987); Pate v. State, 492 So.2d at 1028. The test is objective, for "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. at 442,104 S.Ct. at 3151. Thus, "[a] policeman's unarticulated plan [to take the suspect into custody] has no bearing on the question whether a suspect was 'in custody' at a particular time." Id. Likewise, the suspect's belief that he was in custody is not the determinative factor. See 1 W. LaFave and J. Israel, CriminalProcedure, § 6.6(c) (1984). See also Hooks v. State.
Among the factors to be considered in making this determination are whether the suspect was questioned in familiar or, at least, neutral surroundings; the number of law enforcement officers present at the scene; the degree of physical restraint of the suspect; the duration and character of the questioning; and how the suspect got *Page 869 
to the place of questioning. See 1 LaFave Israel, supra, at § 6.6(c). Other pertinent factors are the language used to summon the individual; the extent to which the person is confronted with evidence of guilt; and the degree of pressure applied to detain the individual. Hooks v. State, slip op. at 36 (quotingUnited States v. Wauneka, 770 F.2d 1434, 1438 (9th Cir. 1985)). Furthermore, "[b]ecause the Court in Miranda expressed concern with the coerciveness of situations in which the suspect was 'cut off from the outside world' and 'surrounded by antagonistic forces' in a 'police dominated atmosphere' and interrogated 'without relent,' circumstances relating to those kinds of concerns are also relevant on the custody issue." 1 LaFave Israel, supra, at § 6.6(f).
In regard to the "very significant factor" of the place of the interrogation, id., it has been observed that "courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings." Id. at 6.6(e). The underlying rationale is that since the suspect is in familiar surroundings, he is not subjected to the same pressures as in the police-dominated atmosphere of the police station. Id. In Minnesota v. Murphy, the Court reviewed the admissibility of a statement made by a probationer interrogated by his probation officer in a meeting held pursuant to the officer's order. In holding thatMiranda was inapplicable because the probationer was not in custody, the Court observed the following:
 "Custodial arrest is said to convey to the suspect a message that he has no choice but to submit to the officers' will and to confess. Miranda v. Arizona, 384 U.S., at 456-457
[86 S.Ct. at 1618-1619]. It is unlikely that a probation interview, arranged by appointment at a mutually convenient time, would give rise to a similar impression. Moreover, custodial arrest thrusts an individual into 'an unfamiliar atmosphere' or 'an interrogation environment . . . created for no purpose other than to subjugate the individual to the will of his examiner.' Id., at 457 [86 S.Ct. at 1619]. Many of the psychological ploys discussed in Miranda capitalize on the suspect's unfamiliarity with the officers and the environment. Murphy's regular meetings with his probation officer should have served to familiarize him with her and her office and to insulate him from psychological intimidation that might overbear his desire to claim the privilege. Finally, the coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained. Id., at 468 [86 S.Ct. at 1624]. Since Murphy was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator."
465 U.S. at 433, 104 S.Ct. at 1145 (footnote omitted). Similarly, questioning has been held to be noncustodial where it occurred at a place of employment. See, e.g., United Statesv. Dockery, 736 F.2d 1232 (8th Cir.), cert. denied,469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 129 (1984) (wherein the defendant was questioned by FBI agents in a small, vacant office in the bank building where she was working); UnitedStates v. Alyea, 636 F.2d 1191 (10th Cir. 1980) (wherein the defendant was interrogated by postal inspectors in the office of the supervisor of the branch post office, where he was working, after being asked by one of the inspectors and the supervisor to accompany them there); Peevy v. State,460 So.2d 248 (Ala.Cr.App. 1984) (wherein the defendant, the county tax collector, was questioned in the county courthouse, with some conversations occurring in his own office).
The facts surrounding Finch's confession, as related by Finch, are in conflict with those presented by the city officials. We are compelled to view the facts in the *Page 870 
light most favorable to the prosecution.[2] United States v.Wallraff, 705 F.2d 980, 987, n. 2 (8th Cir. 1983). They are, as follows.[3] While Finch was working at her desk, City Clerk Olin Sheppard, who was her immediate supervisor, asked her to get her cash box and receipt papers and go with him to the mayor's office, which was located down the hall from Finch's office in city hall. She had been working for Sheppard for four years and had been in the mayor's office "a lot of times." Seated around a table in the mayor's office when they entered were the mayor; Louis Hamner, the city's attorney; Robert Edwards, the city's auditor; and W.E. Montgomery, Chairman of the Utilities Board. None of these men were strangers to her. Finch was informed that they had discovered, through an audit, that there was a shortage in the Utilities Board account and felt like she had taken some city funds. When confronted with this accusation, Finch denied it. Then, the auditor showed her a few examples of what he had found in the audit, and after she repeated that she (lid not know anything about it, she asked if she could speak with the mayor and her supervisor alone. The other men left the room; she began crying; and she immediately, without question, admitted to taking the money. She asked if she would lose her job, and the mayor answered, "Yes." Prior to this confession, she was neither coerced nor threatened in any way nor promised any leniency.
The other three men were then called back into the mayor's office, and they discussed, with Finch, how she took the funds and "all the various details about how it came about." During this time, she was asked if she was willing to "write it out in her own words." Finch replied that she was so willing. No one dictated the contents or made any suggestion about the contents, except the inclusion of the date and her signature. Prior to this confession, no one promised her anything or coerced her in any way to prompt the statement. After she wrote out her resignation, she was asked to come back with her father later that day. The meeting lasted about one-half hour after the three returned to the office.
During Finch's interview, she was not advised of her right to an attorney. However, she was advised two or three times that she did not have to say anything if she did not so desire. She was not told that she had the right to leave the room; but, she was also not told that she could not leave. Finally, she was not threatened with criminal prosecution or restrained in any way.
She left after this interview and, later that day, returned with her father. During the second interview, she gave the officials a list of account numbers and monetary figures. On the following day, she gave the auditor more records, which she had referred to in her confession.
At the time of these interviews, Finch was 24 years old and had post-high school vocational training.
From these facts, we find that the trial court's denial of Finch's motion was proper, for at the time of Finch's confession, she was not deprived of her freedom of action in "any significant way," to a "degree associated with a formalarrest" and, accordingly, no Miranda warnings *Page 871 
were required.[4] It was Finch's burden to demonstrate that her confession was obtained while she was under custodial interrogation, United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984), and, by the evidence presented, she failed to meet her burden. Here, custody did not result from any "psychological restraints" arising from Finch's being the "focus" of the investigation. Moreover, she voluntarily went to the meeting, at her supervisor's request. Even had she been directed to meet with the city officials, such would have not indicated any restriction on her freedom of action. See UnitedStates v. Dockery, 736 F.2d at 1234 (wherein the court relied on the reasoning in I.N.S. v. Delgado, 466 U.S. 210,104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), that employees at work have less freedom to move about because of their voluntary obligation to their employers, to hold that there was no custody where a bank official summoned the defendant to a small, vacant office for questioning by an FBI agent). Finch was questioned in very familiar surroundings and, while the number of city officials who were present might have been somewhat intimidating, Finch knew all of them, some of them for four years or more. She was not restrained physically or so threatened in any manner, and the questioning was not excessive in duration or character. Moreover, her statement was in her own words. Although she was not informed that she was free to leave, "[w]here, as here, the entire context indicates a lack of custody, failure to inform defendant of his status is not dispositive." Davis v.Allsbrooks, 778 F.2d 168, 172 (4th Cir. 1985).
The question of whether a suspect has been subjected to custodial interrogation requiring Miranda warnings is "not an easy one," and the trial court's findings on conflicting evidence must be given great weight. Harris v. State,376 So.2d 773, 776 (Ala. Cir.App.), cert. denied, 376 So.2d 778 (Ala. 1979). "The trial judge's finding of admissibility 'will not be disturbed on appeal unless it is evident that the determination was palpably contrary to the weight of the evidence.' " Watkinsv. State, 497 So.2d 1153, 1154 (Ala. Cir.App. 1986) (quoting Ex parte Singleton, 465 So.2d 443, 445 (Ala. 1985)). The determination of the admissibility of the defendant's confession was within the sound discretion of the trial court, which was in the best position to determine the credibility of the voir dire witnesses by observing their testimony and demeanor. See Lindsey v. State, 456 So.2d 383, 389 (Ala.Cr.App. 1983), aff'd, 456 So.2d 393 (Ala. 1984), cert. denied,470 U.S. 1023, 105 S.Ct. 1384, 84 L.Ed.2d 403 (1985). This determination will not be disturbed on appeal if supported by a preponderance of the evidence. Lindsey; 1 LaFave Israel, supra, at § 10.4(b). We have observed these governing principles of review and concluded that the trial court's ruling was correct; Finch's confession was properly admitted, although it had been made without benefit of Miranda warnings.
Finch also contends that her confession should have been suppressed on the ground that it was the involuntary product of improper inducement and threats. In support of this contention, she points to Finch's testimony that she was threatened with prosecution and offered leniency. Again, this evidence is in conflict; the prosecution's witnesses testified that she was not threatened, coerced, or promised any benefit. Upon this conflicting evidence, the weight of which rests with the prosecution, we find the court's ruling to clearly be within its discretion.
Finally, Finch contends that the documentation supplied by her, on the day following her confession and in support of her confession, was involuntary. We find that this issue was not preserved for our review, for at no time did counsel object to the admission of this evidence. The motion to suppress was directed to the suppression of Finch's written confession of November 27, 1984. During the hearing on Finch's motion, counsel did not amend the motion to move for suppression of the records Finch gave to the city's auditor November 28. Moreover, the oral argument on the *Page 872 
motion addressed only the admissibility of the written confession. The court's ruling only addressed the one: "For purposes of this motion, I am satisfied that the State has shown that the statement was voluntarily given and I am going to deny the motion to suppress." When the documentation was admitted during the trial, defense counsel entered no objection. Since the issue now raised was not presented to the trial court in any fashion, we have no adverse ruling to review. See, e.g., Wood v. State, 416 So.2d 794 (Ala. Cir.App. 1982); Moore v. State, 415 So.2d 1210 (Ala.Cr.App.), cert.denied, 459 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610 (1982).
Based on the foregoing, this cause is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] From the tenor of the suppression motion, the hearing on that motion, and Finch's brief submitted on appeal, we assume that Finch is referring to her written confession. However, we note that our holdings in regard to admission of her written confession are equally applicable to the admission of her preceding oral confession.
[2] Nevertheless, we note the following discrepancies arising from Finch's version of facts expounded during the suppression hearing. Finch testified that, when she first denied the city's attorney's accusations, he told her that if she did not tell that she took the money that he could have her arrested and she would go to prison. She also stated that he told her that if she "went along" with them, they would "work" with her and that lie further told her what to write in composing her confession. In regard to her feeling of freedom to leave, she testified that she was afraid to leave. Finally, the concluded that she signed a confession because she was led to believe that it would result in leniency.
[3] As permitted by Henry v. State, 468 So.2d 896, 899
(Ala.Cr.App. 1984), cert. denied, 468 So.2d 902 (Ala. 1985); we have not limited ourselves to only the review of the same evidence before the trial court at the time of the ruling on the motion to suppress; rather we have looked to the testimony given before the jury to determine the correctness of the court's ruling.
[4] In light of this finding, we deem it unnecessary to determine the issue of whether any of the city officials should be viewed as a law enforcement officer for Miranda purposes.