TAYLOR, Presiding Judge.
The appellant, P.S., was convicted of the willful abuse, cruel beating or otherwise willful maltreatment of a child under the age of 18 by failing to protect the child from physical assault by a third party, in violation of § 26-16-3, Code of Alabama 1975. She was adjudicated a youthful offender and was sentenced to imprisonment in the custody of the State of Alabama for a term of three years.
The evidence tended to show that on the morning of January 26, 1989, the appellant awoke to find her live-in boyfriend, Roland Ray, bathing the appellant’s two-year-old daughter, the victim. After the child was bathed and dressed, the appellant fixed her breakfast, which consisted of eggs and Kool-Aid. During breakfast, the child was very nervous. She regurgitated her undigested food. After this happened, the appellant stripped the child down, changed her diaper, and put fresh clothes on her.
Later that morning, while the child was napping, the appellant decided to vacuum the apartment. Ray insisted on taking the child upstairs even though the appellant assured him that the noise from the vacuum would not awaken her. Ray stayed upstairs with the child until he left the apartment just before noon.
The child woke up at approximately 12:45, which was also about the time that Ray returned. The appellant fixed the child some popcorn for lunch. After coloring a while, the appellant and the child took a nap.
At approximately 3:30 or 4:00 p.m., the appellant and her child awoke. The appellant began cleaning the kitchen. Ray stayed in the den with the child. Ray became very irritated with the child for wanting too much of her mother’s attention. He took the child upstairs while the appellant stayed downstairs.
At about 5.T5 or 5:30 p.m., the appellant decided to take a bath. Ray suggested that she listen to her tape player while she bathed. The appellant had been in the bathtub for an hour or an hour and a half when she heard Ray yelling. She turned off the music, got out of the tub, put on her robe, and ran downstairs. She found Ray violently shaking the child, as if trying to revive her. The child was naked. Her diaper was lying on the floor and was full of soft, black stool.
Because the child’s eyes were rolled back and she appeared to be unconscious, the appellant and Ray wrapped her in a blanket and took her to the emergency room at Northeast Alabama Regional Medical Cen *1211 ter. Upon arrival at the hospital, the child was pale, completely unresponsive to stimulation, and exhibited a condition call “posturing,” which is an involuntary stiffening of the muscles and a rigidity of the head and neck. This condition is indicative of head trauma.
The nurse assigned to the trauma room where the child was taken noticed immediately “fingertip” bruises on the right side of the child’s neck and extending up to her jaw. The same type bruises were observed on her left chest and rib area. A large hand print was on the child’s right buttock, and there were numerous bruises on her legs.
The bruises on the child’s body were in different stages of healing. The bruises on her left chest and rib area were two or three days old. The ones on her legs were of different stages. The “fingertip” bruises on the child’s neck and jaw had been made sometime that day. The hand print on her buttock was very red and had been made within the hour.
The child was transported by helicopter to Children’s Hospital in Birmingham about two hours after her arrival at Regional Medical Center. By this time, the child was comatose and had ceased to breathe on her own. Once at Children’s Hospital, Dr. Patrenos placed a tube in the child’s throat to allow breathing through mechanical means. She also placed the child on a ventilator to reduce the swelling of her brain.
Dr. Patrenos then physically examined the child. She observed the same bruising which had been seen at Regional Medical Center and also found a red, swollen place above the child’s right ear. Her vaginal opening was reddened and very generous. The child’s hymen, although not torn, looked thick as opposed to the thin, translucent appearance of the normal hymen of a girl of her age. The child’s rectum was very red and had a small laceration in it.
In Dr. Patrenos’s opinion, the child had been abused. The bruises were in unusual places and were not consistent with having been caused by the normal falls experienced by a two-year-old. The tear in the child’s rectum was consistent with an object having been placed in it. The thickening of her hymen was indicative of chronic irritation of the tissue.
The child remained hospitalized for two months as a result of her injuries. She was diagnosed as having a subdural hema-toma.
The appellant raises four issues on appeal.
I
The appellant first questions the sufficiency of the evidence to sustain her conviction. She relies upon Phelps v. State, 439 So.2d 727 (Ala.Cr.App.1983), for the proposition that she could not be found guilty of this offense unless she was aware that Ray’s behavior was endangering her child, because her duty to protect her child would arise only when she was so alerted. The appellant contends that she had no knowledge that Ray was abusing her child. After a very thorough reading of the record, we disagree.
On January 5, 1989, the appellant left her child with Ray while she went on a job interview. When she returned, the child was bloody from a cut below her lip. The appellant told her ex-husband that she had witnessed the child fall off her bicycle. She told her mother, however, that Ray had told her that the child had taken a fall. Also, the appellant later told Dr. Patrenos that the cut was not bad enough to need medical attention; she told a social worker, on the other hand, that the cut had required sutures. These contradictory statements could be interpreted as an effort to conceal what really happened to her child.
On January 25, 1989, Pamela Ghee was visiting in the home of the appellant and Ray. The appellant and Ms. Ghee went to the master bedroom to talk. Ray was in the adjacent bathroom with the child. Ms. Ghee heard the child whining and later heard her gagging, as if something was in her throat. Ms. Ghee asked the appellant if the child was okay and was told that she was fine.
*1212 A few minutes later, Ray brought the naked child out of the bathroom. He had only a towel wrapped around his waist. The child reached for Ms. Ghee, and Ms. Ghee noticed that the child was clinging to her “like for dear life.” The child seemed very scared.
Ms. Ghee noticed bruises on the child’s neck and throat and up under her chin, as well as on her chest. When Ms. Ghee asked the child what had happened, the child only held on to her and did not reply. Ms. Ghee then asked the appellant where the bruises had come from. Without even looking at the child, the appellant answered that she had gotten them at the child’s father’s house.
By the appellant’s own admission, the child was very leery of Ray, even though the three had been living together as a family unit for two months. Also, the child had been complaining that her “tee-tee” hurt. As for the torn rectum, the appellant claimed that it was the result of the voluminous bowel movement the child supposedly had before becoming unconscious. Dr. Pa-trenos admitted that a very hard, dry, constipated stool could cause rectal tearing. The appellant, however, claimed the stool in question was “mushy” and, further, that the child had had diarrhea for a few days preceding her hospitalization.
Finally, there was the matter of the conflicting stories the appellant told various people about what had happened to her child on January 26, 1989. She told Dr. Patrenos that the child had suddenly become ill while she was changing her diaper and that the bruises were the result of Ray’s shaking the child in an effort to revive her and holding her jaw to keep her from swallowing her tongue. The appellant then told a social worker that the bruises and the coma happened when the child fell out of her bed. It was not until later that the appellant admitted leaving her child alone with Ray.
We are of the opinion that there was sufficient evidence from which the jury could lawfully infer that the appellant knew that her child was being abused by Ray, and she was also trying to conceal this fact from others. When asked by the district attorney whether she still liked Ray, the appellant replied, “Yeah, maybe I do.”
Evidence to prove knowledge or intent is usually circumstantial. It is entitled to the same weight as direct evidence. Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150, 166 (1954). The mere fact that evidence is of a circumstantial nature does not make it deficient. Linzy v. State, 455 So.2d 260, 262 (Ala.Cr.App.1984). Further, such evidence should be reviewed by this court in the light most favorable to the State, Bass v. State, 55 Ala.App. 88, 313 So.2d 208 (1975), and our judgment should not be substituted for that of the jury. Cumbo v. State, 368 So.2d 871, 875 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Thus, under the principles which are set out above, we find that the factfinder could have been convinced beyond a reasonable doubt of the appellant’s guilt from the evidence presented.
II
Second, the appellant contends that the trial judge applied an incorrect standard in his finding of fact wherein he found the appellant guilty because the appellant could not explain how her child was injured. The appellant points to the following portions of the transcript to support this contention:
“The Court finds that you are a responsible person as defined in this statute; that is, you had custody of the child and you are her mother and you’re responsible for her and you had her in your custody on the 26th and the day or two prior to that time. From the evidence, the Court finds that this child has been abused from all of the bruises and marks that are on it. It’s obvious to the Court from these photographs and the testimony that this child has suffered quite a bit, and the Court has found from the evidence that that has not been reasonably explained. The Court is perplexed as to your lack of knowledge as to your own infant child in that you cannot explain *1213 these things that obviously happened to it. You say you did not see those, yet you had the child. It appears that this child has been victimized. There is no question of that in the Court’s mind. It’s just a question of — the Court is not going to allow the child to be victimized again.... It’s a sad case for it to be this way, but the responsibility rests with the Court to consider the welfare of the child, and that’s what the Court is doing.
“I’m going to find you guilty and sentence you [to] the maximum time I can give you under youthful offender, which is three years. I sentence you to the custody of Alabama as a youthful offender for a period of three years.”
We find that the trial court’s statement is no more than an expression of his disbelief in the appellant’s testimony that she had not seen any bruises on her child and did not know how they had occurred. Moreover, the appellant cites no authority to support this contention. In Johnson v. State, 500 So.2d 494 (Ala.Cr.App.1986) (quoting Vinzant v. State, 462 So.2d 1037 (Ala.Cr.App.1984), this court held:
“ ‘According to A.R.A.P. 45B, this court is not obligated to consider questions or issues not presented in briefs on appeal. The appellant’s brief, according to A.R. A.P. 28(a)(3), shall contain a statement of issues presented for review with principal authorities of law supporting each issue presented. Furthermore, A.R.A.P. 28(a)(5) requires that the argument presented in a brief shall contain contentions of appellant with respect to the issues presented, and the reasons therefore with citations to the authorities, statutes and parts of the record relied on. [Emphasis added in Johnson.]
“ ‘The logic behind these rules is consistent with prior decisions relating to failure of appellant to meet the requirements established by the Alabama Supreme Court for briefs on appeal. Arguments not based on any legal authority have the same effect as if no argument had been made, and the argument will be deemed waived. Jones v. City of Decatur, 53 Ala.App. 470, 301 So.2d 235 (Ala.Cr.App.1974); Terry v. City of Decatur, 49 Ala.App. 652, 275 So.2d 167 (Ala.Cr.App.1973); Adams v. State, 291 Ala. 224, 279 So.2d 488 (1975).’ ”
500 So.2d at 498. Thus, this contention of error is procedurally barred from appellate review.
III
The appellant’s third contention is that the trial judge committed reversible error when he refused to allow testimony regarding the child’s father’s propensity for violence. This testimony was offered to establish that Tommy Smith, rather than Roland Ray, may have caused the injuries to the child.
The record reads, in pertinent part:
“Q Did you ever physically strike Paige while you were married or after you were divorced?
“MS. MORGAN: Your Honor, I’m going to object to that. That has absolutely nothing to do with this case whatsoever.
“THE COURT: Sustained as to the form of the question. If you’ll frame in a shorter period of time, I’ll allow you to ask it, but not that general.”
The trial judge did not refuse to allow testimony concerning Tommy Smith’s propensity for violence, as the appellant asserts. He merely sustained the objection to the form of the question. A ruling by a trial judge must be upheld if it is correct for any reason. Nicks v. State, 521 So.2d 1018 (Ala.Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988).
Thus, the trial court’s ruling concerning the cross-examination of Tommy Smith was not error.
IV
Finally, the appellant contends that the trial court erred in allowing Detective Robertson to testify about the statement that she gave him because she was not given the warnings specified in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The appellant’s contention that such warnings were required in *1214 her case is based solely on the statement in Miranda that the warnings are required in cases of custodial interrogation where questioning is initiated by a police officer after a person has been deprived of his freedom in any significant way. The appellant argues that she was deprived of her freedom because she was 20 years old, had never had any prior difficulty with police officers, was approached by a police officer while at Children’s Hospital, was asked to join him in a private office, and was questioned for two and one-half hours without being told that she was free to leave.
In determining whether interrogation is “custodial,” the court should consider whether the suspect was questioned in familiar or neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint of the suspect, the duration and character of the questioning, how the suspect got to the place of questioning, the language used to summon the suspect, the extent to which the suspect is confronted with evidence of guilt, and the degree of pressure applied to detain the suspect. Finch v. State, 518 So.2d 864 (Ala.Cr.App.1987).
The appellant was questioned in neutral surroundings. This case is very similar to State v. Portigue, 125 N.H. 352, 481 A.2d 534 (1984). In that case, the appellant took his infant daughter to the emergency room of the Frisbie Memorial Hospital in Rochester, New Hampshire, after the child suddenly quit breathing. Both the attending nurse and the medical technician observed extensive bruising and lacerations which were consistent with the child’s having been kicked and beaten with straps and human hands. The appellant was questioned at the hospital by a police sergeant, at which time he said that “his wife ... had been beating the child ... for the past several months.” After the appellant was convicted of endangering the welfare of a child, he appealed, claiming that the police had elicited statements from him in violation of the Fifth and Fourteenth Amendments. The New Hampshire Supreme Court held that the Miranda requirements were not triggered by the police questioning of the appellant at the hospital where he had taken his child, since these were not conditions created by the police to subject the appellant to continued questioning and the appellant had full access to several exits leading from the waiting room to other sections in the hospital or to the street outside, the appellant was not arrested, and, according to the police, he was free to leave. 125 N.H. at 359, 481 A.2d at 540.
In the instant case, there was only one police officer and one social worker present when the appellant was questioned. The social worker testified that she stayed with the family to lend moral support and to make sure their needs were met. The appellant was not restrained physically or threatened in any way.
The appellant was questioned for two and one-half hours; however, this is not as lengthy in duration as it may appear on its face. The police officer testified at trial that:
“... I had two different discussions with Ms. Smith. The first one was not on tape; we were just talking.... We talked on, and then I decided that we should get this on tape after having a discussion. I wanted to get it again on tape. So, I had basically two interviews with her.”
Thus, the appellant actually gave her account of the day’s events twice. We are of the opinion that this two and one-half hour interview was not “custodial interrogation.” The officer asked P.S. if she would answer some questions, to which she agreed, and then suggested that they go to a room where they could have some privacy. The police officer's friendly attitude would certainly alleviate any danger of intimidating the appellant into making an involuntary admission.
Finally, Detective Robertson testified that he did not tell the appellant that she was free to leave because he did not see any reason to have to tell her that. “Where, as here, the entire context indicates a lack of custody, failure to inform defendant of his status is not dispositive.” *1215 Davis v. Allsbrooks, 778 F.2d 168, 172 (5th Cir.1985).
Moreover, in Finch, supra, 518 So.2d at 871, this court held:
“The question of whether a suspect has been subjected to custodial interrogation requiring Miranda warnings, is ‘not an easy one,’ and the trial court’s findings on conflicting evidence must be given great weight. Harris v. State, 376 So.2d 773, 776 (Ala.Cr.App.), cert. denied, 376 So.2d 778 (Ala.1979). ‘The trial judge’s finding of admissibility “will not be disturbed on appeal unless it is evident that the determination was palpably contrary to the weight of the evidence.” ’ Watkins v. State, 497 So.2d 1153, 1154 (Ala.Cr.App.1986), (quoting Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985)). The determination of the admissibility of the defendant’s confession was within the sound discretion of the trial court, which was in the best position to determine the credibility of the voir dire witnesses by observing their testimony and demeanor. See Lindsey v. State, 456 So.2d 383, 389 (Ala.Cr.App.1983), aff'd, 456 So.2d 393 (Ala.1984), 470 U.S. 1023, 105 S.Ct. 1384, 84 L.Ed.2d 403 (1985). This determination will not be disturbed on appeal if supported by a preponderance of the evidence. Lindsey; 1 LaFave & Israel, [Criminal Procedure,] at § 10.4(b) [1984].”
After reviewing the facts and the governing principles, we hold that the appellant’s statement was correctly received into evidence even though it was given without benefit of Miranda warnings.
Appellant received a fair trial. Her conviction is due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur.